[No. E042303. Fourth Dist., Div. Two. Apr. 10, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
WAYNE CLAIR WALDIE, Defendant and Appellant.

COUNSEL

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Pamela Ratner Sobeck and Ronald A. Jakob, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

GAUT, Acting P. J.—

## 1. Introduction[1]

A jury convicted defendant Wayne Clair Waldie of two counts of lewd and lascivious conduct against a child under the age of 14 years. (§ 288, subd. (a).) The court found true the allegations of two one-year prior enhancements involving drug offenses. (§ 667.5, subd. (b).) The court sentenced defendant to a total prison term of 10 years.

---

[1] All statutory references are to the Penal Code unless stated otherwise.

On appeal, defendant challenges the court's refusal to allow evidence of prior molestation allegations made by the victim against someone else. Additionally, defendant claims the court erred by permitting comment on defendant's prearrest silence and his lack of cooperation with the investigation. Defendant asserts the prosecutor committed error by displaying to the jury the word "GUILTY" on his laptop computer. Finally, defendant seeks clarification of the abstract of judgment concerning the court's restitution orders.

We conclude it was error under the Fifth Amendment to allow evidence and argument about defendant's prearrest silence but we deem the error harmless.

We reject defendant's other claims of error and affirm the judgment but remand for the trial court to correct the restitution orders.

## 2. Factual and Procedural Background

Jane Doe was born in March 1989, making her 17 years old at the time of trial. Defendant was born in 1966.

Jane Doe's mother, Colleen, testified she became reacquainted with defendant on New Year's Eve 2001, although she had dated him 10 years previously. Between January and March 2002, defendant and his son often visited Colleen and her children at her apartment in Hemet. Colleen occupied one bedroom and Jane Doe and her older brother and younger sister used the other bedroom. Defendant and Colleen did not have a sexual relationship.

According to Colleen, when defendant stayed over, he would sleep in the living room or on the floor of the children's bedroom to monitor them. Defendant bought food for the family and took them out to the movies. He gave Colleen's son a bicycle and, on Jane Doe's 13th birthday, he took her shopping and out to dinner with a friend, B. He treated Jane Doe as his favorite and told her she was beautiful.

Shortly after Jane Doe's 13th birthday, Colleen became concerned because of conversations she had with a neighbor and some friends of Jane Doe. Colleen's neighbor, G.G., testified that he was working on his car one day while defendant chatted to him. Jane Doe walked by wearing white shorts and defendant commented, "Damn, look at that" and "Man, I'd like to have that thing right there sit on my face." G.G. warned Jane Doe and her mother about defendant.

Colleen also found some writings and drawings from defendant in Jane Doe's room. One drawing was of a large-breasted woman. A note dated

February 11, 2002, read ". . . cuddlebug, I want you to know that you are very special to me. You are always in my thoughts and dreams. I want to thank you for the warmth, love and respect that seems to have no end. You have a special gift to express love in so many ways. Never, ever change. My heart is forever yours. Love, Wayne."

The second note, dated March 5, 2002, just before Jane Doe's birthday, stated, "Hey, baby girl, it's 12:15 and I can't sleep. . . . I am kind of dwelling on what to—what you said earlier about how could I love you so much and how you said that's bullshit. Well, maybe all the other men in your life are to blame for this. You can ask your mom about how I am . . . one of the most sensitive and considerate men she has ever known . . . . Maybe you can expect me to be there for anything you may need if it's within my reach, no matter what kind of relationship your mom and I have. I know that deep down inside you truly know that I care this much for you and that maybe you don't know how to deal with it. That's okay. In time you will see, just as long as you still care to have someone to fill this empty daddy spot. I will be there for you and your brother and sister, but mostly for you, of course, ha-ha. One day at a time. But for now my whole world surrounds you. Love always, Wayne." "P.S., happy birthday, teenager."

Jane Doe did not want to discuss her mother's concerns and she also seemed to want to avoid defendant. In March 2002, Colleen told defendant she did not want to see him anymore or she would call the police. In June, he wrote her a letter asking her to call him but she never did. Finally, Colleen made a report to the police. Afterwards Jane Doe became more withdrawn and difficult.

Jane Doe testified that Wayne treated her well on the weekends he spent at the apartment. On her birthday, he gave her a $100 gift certificate and took her out to dinner. They went to the Red Lobster with B. and visited the Mission Inn where he joked about renting a room. He flirted with her and told her she was "beautiful and hot." He showed her the most attention in the family.

On two occasions, he put his hands down her pants. In February 2002, she was in bed at night and he placed his hands under her clothes and between her legs. But his hands did not go inside her underwear. Jane Doe described defendant rubbing "my vagina."[2] She got up and went to sleep in the living room. The second time, defendant repeated the behavior, putting his hands under her clothes, "partly on my vagina and partly not." When she asked him

---

[2] It is unclear from Jane Doe's testimony how defendant could be touching her internal genitalia while his hand stayed outside her underwear. Jane Doe probably meant "genitals" not "vagina."

what he was doing, he removed his hand and acted as though he had been sleeping. Again she left and slept in the living room. She told the police she thought she was dreaming about the first incident but then she realized it was real. After these incidents, she missed a lot of school for two years. She confided what had happened to B.

A clinical psychologist explained Child Sexual Abuse Accommodation Syndrome, especially that it is common for a victim to disclose the abuse to a peer while not telling her parent.

A Hemet police officer testified that, after Colleen made a report, he contacted defendant by phone about a dozen times but they never met in person for an interview.

Defendant did not testify. His former stepdaughters testified on his behalf that he was never inappropriate with them and they continue to have a close relationship with him. Defendant's son, J., also testified defendant's behavior was appropriate with Jane Doe and her siblings. He claimed defendant never slept with the girls in the second bedroom. Defendant, J., and Jane Doe's brother all slept in the living room.

Jane Doe's friend, A., testified that Jane Doe joked about defendant's buying wine coolers and renting a hotel room on her birthday. A. reported that Jane Doe was a heavy sleeper. Jane Doe told A. defendant had touched her breast and one time she awoke feeling sore in her genital area. Jane Doe speculated to A. that defendant may have touched her while she slept. A. informed both Colleen and her own mother about what Jane Doe had said.

### 3.   Prior Molestation Allegations

The trial court denied defendant's pretrial motion to admit evidence that Jane Doe had made prior allegations of sexual molestation against a man named Mark. The trial court ruled the prejudice of such evidence outweighed its probative value. Additionally, the evidence was so slight as to be irrelevant on the issue of Jane Doe's credibility.

After review, we find no abuse of discretion. (*People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 P.2d 897].) As discussed in *People v. Alvarez* (1996) 14 Cal.4th 155, 201 [58 Cal.Rptr.2d 385, 926 P.2d 365], where the superior court has impliedly determined that any relevance of evidence of a prior molestation complaint had for impeachment was premised on the falseness of the prior complaint, it was not unreasonable to exclude such evidence: "Indeed, under the reasoning of *People v. Neely* (1964) 228 Cal.App.2d 16, 18 [39 Cal.Rptr. 251], if her prior complaint was in fact true,

it would have no relevance for impeachment whatsoever. The superior court also impliedly determined that the premise that the prior complaint was false was without sufficient support. In this regard too, it was not unreasonable."

The same reasoning applies whether the evidence is sought to be admitted under Evidence Code section 352 or sections 780 and 782. Here defendant offered no credible evidence that Jane Doe had previously made false accusations. We also reject any constitutional claims based on the trial court's purported evidentiary error. (*People v. Alvarez, supra*, 14 Cal.4th at p. 202, fn. 12.) The trial court did not abuse its discretion in excluding evidence of previous accusations by Jane Doe.

### 4. Fifth Amendment Right Against Self-incrimination

The Hemet detective testified that defendant never participated in a police interview, even after a dozen phone calls, before he was arrested. After defendant's final promise to call back, he never did. The court overruled the defense counsel's objection to the detective's testimony on the ground of hearsay. The court instructed the jury that defendant's statement promising he would call back tended to show consciousness of guilt. (CALJIC No. 2.03.) In closing argument, the prosecutor commented that defendant did not cooperate with the police investigation. Defendant argues his rights to due process and against self-incrimination were violated by the foregoing. Defendant urges this court to follow the majority view that the prosecution may not use evidence of defendant's prearrest silence as evidence of guilt in the case-in-chief. Based on the particular circumstances of this case, we agree with defendant but we find the error harmless.

■ Defendant complains that the testimony and comment about defendant's prearrest silence violated his right to remain silent. The issue of whether a defendant's prearrest silence is protected by the Fifth and Fourteenth Amendments was addressed by the United States Supreme Court in *Jenkins v. Anderson* (1980) 447 U.S. 231 [65 L.Ed.2d 86, 100 S.Ct. 2124]. "In *Jenkins*, the petitioner stabbed and killed one Doyle Redding on August 13, 1974. He was not apprehended until he turned himself in about two weeks later. At his trial for first degree murder, the petitioner contended that the killing was in self-defense. During the cross-examination, the prosecutor questioned the petitioner as to whether he had told the police what had happened. He said he had not. The prosecutor also referred to petitioner's prearrest silence in his closing argument. [¶] In rejecting petitioner's claim that his constitutional rights were violated, the Supreme Court pointed out that petitioner's failure to speak occurred before he was taken into custody and given the *Miranda*[3]

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

warnings. Since no governmental action induced the petitioner to remain silent before arrest, continued the court, the fundamental unfairness present in *Doyle* [*v. Ohio* (1976) 426 U.S. 610, 619 [49 L.Ed.2d 91, 96 S.Ct. 2240], in which the Supreme Court held that the use for impeachment purposes of the defendant's silence at the time of arrest and after receiving *Miranda* warnings violated the due process clause of the Fourteenth Amendment,] . . . was not present in the case. In accordance therewith, the Supreme Court held that the use of prearrest silence to impeach a defendant's credibility violates neither the Fifth Amendment nor the due process clause of the Fourteenth Amendment. [Citation.]" (*People v. Burton* (1981) 117 Cal.App.3d 382, 386 [172 Cal.Rptr. 632].)

Thus, although the Supreme Court has held that the government may comment on a defendant's prearrest silence for impeachment purposes, it has yet to rule on the constitutionality of the use of prearrest, pre-*Miranda* silence as substantive evidence of guilt. However, the Ninth Circuit addressed the issue in *U.S. v. Oplinger* (9th Cir. 1998) 150 F.3d 1061. The court in *Oplinger* stated: "In his concurrence in *Jenkins*, Justice Stevens wrote that he would have rejected the defendant's Fifth Amendment claim simply because the privilege against compulsory self-incrimination is irrelevant to a citizen's decision to remain silent when he is under no official compulsion to speak. [Citation.] . . . 'The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence *before he has any contact with the police.* . . . When a citizen is under no official compulsion whatever, either to speak or to remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, *the question is whether petitioner was in a position to have his testimony compelled* and then asserted his privilege, *not simply whether he was silent.* . . .' [Citation.]

"We agree. . . . In *United States v. Giese*, 597 F.2d 1170 (9th Cir. 1979), in response to the defendant's argument that the use of his pre-arrest silence violated his privilege against self-incrimination, we held that '[n]either due process, fundamental fairness, nor any more explicit right contained in the Constitution is violated by the admission of the silence of a person, not in custody or under indictment, in the face of accusations of criminal behavior.' [Citation.] [¶] Applying our existing precedent, therefore, we must hold that the admission of testimony regarding the May 18th meeting did not offend Oplinger's privilege against self-incrimination under the Fifth Amendment or his right to due process under the Fourteenth Amendment." (*Oplinger, supra*, 150 F.3d at pp. 1066–1067.)

Other federal circuits agree with *Oplinger*. Although the Fifth Amendment protects against compelled self-incrimination, it does not "preclude the proper

evidentiary use and prosecutorial comment about *every* communication or *lack* thereof by the defendant which may give rise to an incriminating inference." (*U.S. v. Zanabria* (5th Cir. 1996) 74 F.3d 590, 593.) The government may comment on defendant's silence if it occurred before his arrest and *Miranda* warnings. (*U.S. v. Rivera* (11th Cir. 1991) 944 F.2d 1563, 1568.)

As both parties recognize, some federal courts take a different view: "We agree with the reasoning expressed in the opinions of the Seventh, First, and Tenth Circuits, and today we join those circuits in holding that the use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination. Like those circuits, we believe 'that application of the privilege is not limited to persons in custody or charged with a crime; it may also be asserted by a suspect who is questioned during the investigation of a crime.' [Citation.]" (*Combs v. Coyle* (6th Cir. 2000) 205 F.3d 269, 283.)

■ Here, the Hemet detective testified that defendant did not follow up on his promise to call when the detective was attempting to investigate the case. But the detective went beyond saying the defendant did not call him back. In fact, the detective described repeated attempts to contact defendant— more than a dozen times—making it appear that defendant was evading the police. The prosecutor also placed emphasis on defendant's continuing failure to call the police. We conclude the evidence and argument violated the Fifth Amendment because defendant was deprived of any meaningful right to refuse to talk to the police. If the police are allowed to call a suspect persistently and then offer his unwillingness to respond as evidence of guilt, a defendant would never be able to claim the protection of freedom from incrimination. A different result might be indicated if the detective had called defendant only one time or a few times. But testimony about repeated phone calls and apparent evasiveness by defendant is constitutionally infirm.

Even though we are inclined to accept defendant's arguments about self-incrimination, any error in admitting the testimony was harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]. The testimony of Jane Doe and her mother was credible, consistent, and plausible. Jane Doe's testimony was also supported by her friend, A., in whom Jane Doe confided soon after the subject incidents occurred. The disinterested testimony of the neighbor about defendant's lewd comments regarding Jane Doe was also persuasive. Defendant's suggestive drawings and his inappropriate letters to Jane Doe were highly incriminating, as was his questionable conduct on Jane Doe's 13th birthday. Moreover, the issue before the jury was essentially one of the credibility of the victim. The jury's verdicts necessarily imply an acceptance

of the victim's testimony. Thus, any error in admitting the detective's testimony and allowing the prosecutor's argument could not have affected the jury's verdicts in this case and was harmless beyond a reasonable doubt. (*People v. Earp* (1999) 20 Cal.4th 826, 858 [85 Cal.Rptr.2d 857, 978 P.2d 15], citing *Chapman, supra*, 386 U.S. 18.)

### 5. Additional Prosecutorial Error

An additional example of prosecutorial error, as claimed by defendant, is the display on the prosecutor's laptop computer of the word "GUILTY," which may have been briefly visible to the jury as it entered and exited the court during closing arguments. Defendant claims the display may have improperly had a subliminal effect on the jury. We conclude the trial court did not abuse its discretion in denying defendant's motion for mistrial.

We defer to the trial court's ruling if it is supported by substantial evidence. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724 [208 Cal.Rptr. 708]; *People v. Drake* (1992) 6 Cal.App.4th 92, 97 [7 Cal.Rptr.2d 790].) We are persuaded this record does not demonstrate prosecutorial error under state or federal law: " 'The applicable federal and state standards regarding prosecutorial misconduct are well established. " 'A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves " ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " [Citation.]' [Citation.]" (*People v. Hill* (1998) 17 Cal.4th 800, 819 [72 Cal.Rptr.2d 656, 952 P.2d 673].)

The unfortunate, but inadvertent and casual, display of a single word fairly characterizing the prosecutor's position does not qualify as intemperate, egregious, unfair, deceptive, or reprehensible conduct. Nor did defense counsel preserve an objection by seeking a curative admonition. (*People v. Hill, supra*, 17 Cal.4th at p. 820.) Under these circumstances, we reject defendant's claim of prosecutorial error.

### 6. Restitution Orders

The probation report recommended the court impose the following restitution fines: for count 1, $4,800 pursuant to section 1202.4 and another $4,800, suspended, pursuant to section 1202.45; for count 2, $200 pursuant to section 1202.4 and another $200, suspended, pursuant to section 1202.45. The court followed that recommendation in its oral pronouncement of judgment. The

abstract of judgment lists two $4,800 fines pursuant to section 1202.4; one $4,800 fine, suspended, pursuant to section 1202.45; and two $200 fines, suspended, pursuant to section 1202.45. In other words, it added an extra $4,800 fine and an extra suspended $200 fine and omitted one $200 fine. Additionally, defendant argues there cannot be two sets of restitution fines for each count. The People disagree, arguing the restitution fine for both counts should have been $4,000, not $4,800 and $200.

We cannot reconcile the inconsistencies between the court's pronouncement, the minute order, and the abstract of judgment. For that reason, we agree with the parties the case should be remanded to clarify the confusion about the restitution orders. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185–186 [109 Cal.Rptr.2d 303, 26 P.3d 1040].)

### 7. Disposition

We reject defendant's claim of cumulative error. We affirm the judgment but remand for correction of the restitution orders and the abstract of judgment.

King, J., and Miller, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 12, 2009, S173305. Moreno, J., and Corrigan, J., did not participate therein.