Filed 5/10/13

CERTIFIED FOR PARTIAL PUBLICATION*

**COPY**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| THE PEOPLE, | C065059 |
| Plaintiff and Respondent, | (Super. Ct. No. 08F10271) |
| v. | |
| MARITZA GRISEL RAMOS et al., | |
| Defendants and Appellants. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Laurie M. Earl, Judge.  Affirmed.

Roberta Simon, under appointment by the Court of Appeal, for Defendant and Appellant Maritza Grisel Ramos.

Hilda Scheib, under appointment by the Court of Appeal, for Defendant and Appellant Nereida Karina Ramos.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon, and Carlos A. Martinez, Deputy Attorneys General, for Plaintiff and Respondent.

_____

* Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Part I of the Discussion.

1

Defendants (and sisters) Maritza Grisel Ramos and Nereida Karina Ramos, along with codefendant Santino Chavez, were convicted after jury trial of five counts of assault with a deadly weapon (Pen. Code, § 245(a)(1)),[1] one count of assault by means of force likely to produce great bodily injury, and one count of simple assault (§ 240), a lesser included offense. The jury found the weapons use allegations not true as to Maritza and Karina. The jury found true allegations that Chavez personally used a deadly weapon as to counts one, two, five and six.[2]

As to both Maritza and Karina, the trial court found unusual circumstances, suspended imposition of sentence, and placed them on five years' formal probation on the six felony counts and three years' informal probation on the misdemeanor count under specified terms and conditions, including county jail time.

Maritza contends there was insufficient evidence to support her convictions. Maritza also makes related arguments concerning two evidentiary rulings. She contends that the trial court erred prejudicially in admitting evidence of her lack of cooperation with the police, i.e., that she failed to keep at least one appointment or otherwise talk to the police about the charged offenses prior to her arrest. She further contends that the trial court erred in admitting evidence concerning the date of her arrest.

Karina contends there was insufficient evidence to support her convictions on all but count three, the count in which she was found guilty of a lesser included misdemeanor simple assault.

---

[1] Undesignated statutory references are to the Penal Code.

  For clarity, we shall refer to appellants as Maritza and Karina (the name by which witnesses call defendant Nereida Karina Ramos).

[2] Chavez is not a party to this appeal.

In the published portion of this opinion, we conclude that Maritza has forfeited the argument that she invoked her right to remain silent by failing to object on that specific ground in the trial court. We further conclude that any error related to the admissibility of defendant's precustody/pre-Miranda silence reflected by her failure to keep interview appointments with a police investigator was harmless.

In the unpublished portion of this opinion, we conclude there was sufficient evidence to support defendants' convictions on the theory of aiding and abetting, and that any error concerning her arrest was harmless.

We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

The three defendants and others participated in the assault of six people when the victims returned to Sacramento after a birthday bus trip to a club in San Francisco. Although it was alleged that defendants personally used a deadly weapon in counts one through six, the prosecution did not seek to prove that Maritza or Karina personally used weapons. Except as to count three, where Karina was the actual perpetrator, the prosecution asserted that defendants were criminally liable on theories of aiding and abetting and natural and probable consequences.

Defendants were charged by amended information with six counts of section 245, subdivision (a)(1), assault with a deadly weapon.[3] The seventh count alleged assault by means of force likely to produce great bodily injury.[4]

---

[3] The victims on the deadly weapon counts were: count one - Robert Mendoza; counts two and three - Lupe Castillo; count four - David Bernhard; count five - Bambi Murray; count six - Rick Vaughn.

[4] The victim on count seven, assault by means of force likely to produce great bodily injury, was Joel Merical.

Together with her friends Anita Meneses and Vanessa Uclaray, Maritza organized a party bus trip to San Francisco, which took place on the night of November 15, 2008. The occasion was a birthday celebration for Meneses and Maritza. The bus left Sacramento from Uclaray's house sometime after 8:00 p.m. with 22 to 28 passengers. Some were strangers to Maritza, who had been invited by Meneses because they needed more passengers to make the trip affordable. However, Maritza did know Castillo. Maritza and Castillo had had prior verbal disputes. Neither Karina nor Chavez accompanied the partygoers on the bus.

According to Meneses, during the trip to San Francisco, Maritza was upset because there were too many people on the bus, she did not get to sit where she wanted, and things were not going as she had planned. At one point Meneses and Maritza had a "little heated talk" about the situation. Meneses went to the back of the bus to avoid Maritza. Maritza sat toward the front with her friends, including her boyfriend and Uclaray. There was a dancing pole in the back of the bus where Meneses and her group sat. On the way to San Francisco, the passengers drank, danced, and socialized.

The partiers planned to go to a nightclub that allowed free admission for those who entered before 11:00 p.m., but they arrived too late. This upset Maritza. Instead, they went to a nearby bar suggested by Meneses, the Holy Cow. The groups separated inside the bar. According to Meneses, Maritza still looked upset while they were in the bar.

Sometime around 1:15 a.m., the group emerged from the Holy Cow. Because some of them lingered outside instead of boarding the bus, Maritza, who did not want to pay overtime charges for the bus, yelled at them to board the bus. In doing so, Maritza called some of the women "hoes." One of the women took exception and exchanged words with Maritza. Others joined in the argument. They called Maritza a "bitch" and told her, "fuck you." Castillo was one of the women arguing with Maritza. The verbal argument quickly became physical. After Castillo and others pushed Maritza, Maritza's

4

boyfriend grabbed Castillo by the neck and slammed her on a bus seat, while Maritza's friend Jasmine Edwards threw a bottle at another woman. A second fight, including shoving and hair pulling, then erupted between Maritza and Castillo.

Maritza demanded that some people be kept off the bus, but Meneses, who rented the bus on her credit card, thought it was her decision to make. Meneses testified that Maritza, Uclaray, their boyfriends, and Edwards then refused to get on, even after Meneses told them to do so.

Vaughn, the bus driver, had decided independently not to let Maritza back on because she appeared an "out-of-control type of mad." He thought if she got on the bus, there would probably be another fight. In a phone conversation, his boss told him that the decision on who could ride was up to the cardholder. According to Vaughn, Meneses picked out several people, including Maritza, who should not get back on.

Thus, whether on their own volition or because they had been banished from the bus, Maritza, Uclaray, their boyfriends, and Edwards remained behind when the bus started back to Sacramento around 2:15 a.m. Maritza looked "pissed off." As the bus pulled away, she was using her cell phone.

Uclaray testified for the defense that she called a cousin in San Francisco. The cousin and her boyfriend drove separate cars to the scene, leaving one for the stranded group. They drove it to Sacramento, getting back before the bus. Maritza made calls before and after the group left San Francisco, but Uclaray claimed she did not know who Maritza called. Sacramento Police Officer David Putman interviewed Uclaray shortly after the crimes occurred. He testified Uclaray told him that while they were traveling back to Sacramento, Maritza told someone over the phone how unhappy and mad she was about the way the night had unfolded.

On the way back to Sacramento, Cynthia Ballesteros and two of Maritza's other friends stayed together in the front of the bus. Ballesteros testified that Maritza called her

5

from Sacramento and asked her to search the bus for Maritza's purse, which Ballesteros could not find.[5]

The bus pulled up in front of Uclaray's house in Sacramento around 4:20 a.m. As the bus arrived, Meneses saw people coming from Uclaray's house, including Maritza, Karina, Karina's boyfriend Chavez, Edwards, and at least two Hispanic men Meneses did not recognize.[6] All were wearing sweatshirts and sweatpants, and Maritza and Karina had their hair pulled up in ponytails. Castillo believed that Maritza and Karina had come to "jump" the passengers and had put up their hair to keep it from being pulled. Some of the men were carrying small bats; one had what appeared to be a pipe. According to Meneses, the group was walking behind Maritza, who was smiling for the first time that night. Meneses had known Maritza a long time and she construed Maritza's smile as vindictive -- "like she was going to show us."

Ballesteros and Maritza's other friends got off the bus, hugged Maritza, and left. Edwards hit the side of the bus and challenged people to come out and fight, while the men in the group confronted male passengers getting off. According to Amanda Moore, one of the partygoers on the bus, the woman who was hitting the side of the bus pointed at Castillo and yelled "that bitch" and "get off."

Meneses saw four men, including Mendoza, Bernhard, Merical, and Adam Tellier, being attacked. Meneses identified codefendant Chavez as one of the people who attacked Bernhard and Mendoza.

Bernhard testified that as he was getting off the bus he saw Maritza and two men come around the front of the bus and assume a position on the right side of the

---

[5] See footnote 8, *post*.

[6] Meneses thought the group totaled nine or 10. Another passenger thought there could have been 15.

bus. One of the men was holding a small wooden bat and the other a piece of PVC pipe. One of the men told Bernhard he should leave, and Bernhard said he would leave after the other people with whom he had come got off the bus safely. Shortly thereafter, the man with the bat hit Bernhard in the forehead with the bat, then repeatedly struck him in the head and stomach until he started to fall. When Merical tried to help, he was attacked in turn. Another passenger saw a circle of men beating and kicking Bernhard and Merical on the ground.

Mendoza testified that when he got off the bus, he was surrounded by a "crowd of guys" who said, "Why did you guys leave them behind?" and "You left them behind." Mendoza was struck several times in the head by one of the men with a small bat and lost consciousness for a minute or two. When he woke up, he was lying on the ground. Mendoza said Chavez was part of the group that was accusing him of leaving people behind, but he could not say which man hit him with the bat.

Meneses warned the passengers at the back of the bus, including Castillo and Murray, that they would get jumped if they got off the bus. Because there was no rear exit, they were trapped.

Karina boarded the bus followed by Chavez, who had a small wooden bat in his hand. Walking past one of the other passengers, Karina headed straight for Castillo. Karina said to Castillo, "You want to fuck with my sister?" and grabbed Castillo's hair. Chavez struck Castillo on the back of the head with the bat, knocking her face first into the bus seat. Karina scratched Castillo's face and stabbed her in the back of the head with a set of keys. After Castillo wrested the keys away, Chavez punched Castillo in the jaw.[7]

---

[7] As noted, the jury found the weapon use allegation true as to Chavez alone on count two (the bat), but not true as to any defendant on count three (the keys).

As the assault on Castillo proceeded, a man told Murray he was going to "fuck [her] up" and hit her on the forehead with a small wooden bat. Meanwhile, Maritza[8] and Edwards boarded the bus and yelled at the remaining passengers.

After Edwards got Meneses down onto the bus floor, a Hispanic man asked Edwards: "Is she one of them?" Edwards said yes. The man hit Meneses in the side of the head with a bat or club.[9]

Vaughn, the bus driver, pulled the assailant off Meneses, allowing her to escape and call 911. That assailant then struck Vaughn twice in the forehead. Vaughn described the object with which this man hit him and Meneses as a wooden dowel that looked like a cut-down closet hanger bar. Another man then punched Vaughn in the jaw.

Someone said the police were coming. Maritza said to Karina and Chavez, "Come on you guys. Come on you guys. Let's go." The assailants scattered. Meneses saw Maritza's car and a big truck drive off. The police did not find defendants at the scene.

Two days later, Karina phoned Meneses. Karina asked how the police knew who she was. Karina knew Meneses had given the police her name and asked Meneses not to testify against her because Meneses was the only one who knew her identity.

During his investigation, Sacramento Police Detective Arnel Aquino contacted Maritza, whom Aquino described as uncooperative and argumentative. She told Aquino she did not want to talk about the incident and refused to give a statement in person or

---

**8** According to Ballesteros, Maritza boarded the bus after its return to Sacramento only to find her purse. However, three prosecution witnesses testified that they did not see Maritza try to recover anything from the bus or hear anyone say he or she was looking for the purse. In closing argument, counsel for Maritza argued that after the bus returned to Sacramento, Maritza "was there to get her purse, she went on the bus looking for her purse."

**9** Meneses was the only victim who was not hospitalized.

over the phone. During one of the three phone conversations Aquino had with Maritza, she agreed to come talk to him, but she did not keep the appointment.

Jessica Jimenez testified during the defense case. During the prosecution's rebuttal case, Jimenez was impeached with a statement she had previously provided to Aquino. Aquino testified that Jimenez said when the bus returned, "a bunch of people came out of the house." Maritza and "another girl" were wearing sweatshirts and had their hair pulled back in ponytails. They "looked like they were ready for a fight." The girl who had been with Maritza assaulted Castillo, saying something about "not fucking with my sister."

Defendants did not testify.

## DISCUSSION

### I. Insufficient Evidence Contention

Defendants contend there was insufficient evidence to support their convictions (except for Karina's conviction of simple assault on count three). We disagree.

We review insufficient evidence contentions under the substantial evidence standard. We "must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--evidence that is reasonable, credible and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citations.] *The same standard applies when the conviction rests primarily on circumstantial evidence.* [Citation.] Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be

9

reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]" ' [Citation.]" (*People v. Kraft* (2000) 23 Cal.4th 978, 1053-1054, italics added.)

The People argue that, except for count three as to Karina, defendants were guilty on all counts based either on aiding and abetting or the natural and probable consequences doctrine. We conclude that substantial evidence supports defendants' convictions on counts one, two, four, five, six and seven as aiders and abettors.[10]

The law imposes criminal liability as principals on both the direct perpetrators of an offense and those who aid and abet in its commission. (§ 31; *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117.) "[A] person who aids and abets a crime is guilty of that crime even if someone else committed some or all of the criminal acts." (*McCoy*, *supra*, 25 Cal.4th at p. 1117.)

" '[A]n aider and abettor is a person who, "acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' [Citations.]" (*People v. Jurado* (2006) 38 Cal.4th 72, 136 (*Jurado*).)

---

[10] As to natural and probable consequences, the prosecution argued during the instruction conference that if defendants had intended to commit simple assault, then it was a natural and probable consequence of their conduct under the circumstances that assault with deadly weapons would occur. The trial court suggested that since deadly weapons were brought to the scene, it appeared more likely that assault with deadly weapons was intended all along. Nevertheless, the court instructed the jury on the prosecution's theory.

Because aiding and abetting is a sufficient basis to uphold defendants' convictions on all the challenged counts, we need not decide whether the People's natural and probable consequences theory would also support defendants' convictions.

Mere presence at the scene of a crime or failure to prevent the crime is insufficient for aider and abettor liability. (*People v. Richardson* (2008) 43 Cal.4th 959, 1024.) But the trier of fact may consider these factors in determining such liability, along with " 'companionship, flight, and conduct before and after the crime.' [Citation.]" (*People v. Garcia* (2008) 168 Cal.App.4th 261, 273 (*Garcia*).)

Viewing the evidence most favorably to the judgment and drawing all reasonable inferences in its support, as we must do, substantial evidence supports defendants' convictions as aiders and abettors of all the assaults (aside from count three, as to which Karina was liable as a perpetrator).

Maritza had a strong motive to promote, encourage or instigate the commission of the assaults -- revenge on those who clashed with her, disrespected her, ruined her birthday party and threw her off the bus she had helped to charter. (See *People v. Gonzales* (1948) 87 Cal.App.2d 867, 877-878 [motive may tend to establish guilt].)

Before returning to Sacramento, Maritza communicated her anger to at least one person over the telephone. After her return, the avenging mob, which included all three defendants, had formed. Maritza led the mob out of the house and toward the bus with a vindictive smile on her face. One witness testified that Maritza and two armed men came around the front of the bus together and positioned themselves on the right side of the bus, apparently near the door. This evidence supports the quite reasonable inference that Maritza personally instigated the formation of the mob, which included her sister Karina, and led this mob in the assault.

Moreover, the fact that the mob allowed safe passage to Maritza's friends before assaulting the others showed that the attack was not driven by blind rage, but by the desire to avenge Maritza. Karina's words to Castillo, a person with whom Maritza had fought in San Francisco -- "You want to fuck with my sister?" -- plainly showed that she and Chavez acted out of that motive. And the conduct of Edwards, also left behind in San Francisco -- her challenge to the passengers to come out and fight, pointing at

11

Castillo while demanding that Castillo get off the bus, and her involvement in the assault on Meneses, during which she told an armed man that Meneses was "one of them" -- showed that the other participants shared the motive of righting the supposed wrongs done in San Francisco.

While neither Maritza nor Karina was armed, the male members of the mob were armed. Even if neither Maritza nor Karina proposed the arming scheme, their participation in the mob without discouraging the use of the weapons showed that they endorsed the use of weapons. (*Garcia*, *supra*, 168 Cal.App.4th at p. 273 [failure to take steps to attempt the prevention of the crime is a factor to consider in determining whether a person is an aider and abettor].) In addition, their dress and hairstyles, and their presence alongside the armed men, signaled their intent to assault the partygoers who had stranded Maritza, and Karina's conduct bore out her intent. The evidence showed defendants knew, and intended to facilitate or encourage, the unlawful purposes of their coparticipants. (*Jurado*, *supra*, 38 Cal.4th at p. 136.)

Finally, defendants fled the scene on Maritza's advice -- "Come on you guys. Come on you guys. Let's go." And Karina later tried to persuade Meneses not to testify against her. Flight and conduct after the crime are factors the jury may consider in determining whether a defendant acted as an aider and abettor. (*Garcia*, *supra*, 168 Cal.App.4th at p. 273.)

Defendants apparently misunderstand the standard of review. They highlight the evidence and inferences that are favorable to themselves. They stress that neither defendant personally assaulted anyone but Castillo, a point which is irrelevant to aiding and abetting. They assert a lack of direct evidence of verbal commands, planning or motive, but ignore the reasonable inferences we have discussed. Indeed, on their view of the case, it is impossible to understand how and why the mob formed, or why those in it let certain people go and attacked others.

Substantial evidence supported defendants' convictions.

12

## II.  Evidentiary Contentions

Maritza contends the trial court erred prejudicially by admitting two pieces of evidence over her objection.  First, she complains the court wrongly overruled her Evidence Code section 352 objection to the testimony of Detective Aquino that before her arrest she was uncooperative and refused to give a statement.  Second, she complains the court wrongly overruled her relevance objection to Aquino's testimony regarding the date of her arrest.  We conclude that any error was harmless.

### A.  Lack of Cooperation with the Police
### and Invocation of the Right to Remain Silent

Detective Aquino testified that after obtaining the names of the three bus trip organizers, he first contacted Meneses and Uclaray, who were cooperative, then Maritza, who was uncooperative.  Maritza's counsel objected and asked to approach the bench.  Thereafter, the trial court heard argument outside the jury's presence.

Defense counsel told the court, ". . . My understanding is [the prosecutor] is going to ask -- . . . is going to inquire of Officer Aquino if my client, Maritza Ramos, was contacted by him where she indicated she would come in and talk to him and give a statement but she did not do so.  And I believe this happened on two occasions that Officer Aquino contacted Maritza or perhaps Maritza's sister or a friend of Maritza, somehow conveying a message to Maritza that she needs to come in and talk to Officer Aquino about the events that happened on November 16th.  [¶]  It's my contention that Maritza, under California law, has no duty to report any crimes or to come in and talk to police officers, certainly when she's most likely going to be a suspect, as she is here today a defendant.  [¶]  I believe the fact that she broke appointments with Officer Aquino or did not show up as she indicated is no indication of a consciousness of guilt.  Rather, it is an indication of her knowledge of her right not to speak to the police officer, not to report any crimes, to exercise her Fifth Amendment right to not provide any testimony against herself should her statements ever be used against her.  [¶]  Therefore, I

would say that this line of questioning regarding Miss Ramos'[s] failure to contact Officer Aquino is irrelevant, and I would ask the Court to not permit it under Evidence Code section 352 as it is overly prejudicial and adds no probative value to the facts that we're looking at here today."

Without directly responding to the Fifth Amendment argument, the prosecutor replied, "first of all, the defendants were arrested on warrants after those contacts occurred. And these are phone contacts. There's certainly no *Miranda* issues or anything like that. [¶] And it seems that her level of cooperation in the investigation is extremely relevant to her consciousness of guilt and the fact that she was argumentative and defensive with him throughout their conversations. She said that she would meet with the officer and then failed to do so, as opposed to the other witnesses who cooperated with the investigation, I think just goes to show, like I said prior at side bar, consciousness of guilt. [¶] There are no issues -- legal issues that would exclude these statements or prohibit these statements at all."

The trial court overruled Maritza's Evidence Code section 352 objection and allowed the testimony. Before the court made its ruling, neither defense counsel nor the prosecutor informed the court of the specific responses Maritza had given to Aquino's requests or questions. The defense did not request an Evidence Code section 402 hearing to be held outside the presence of the jury. The court made its ruling solely on defense counsel's offer of proof and objection to evidence that Maritza had failed to keep appointments.

Detective Aquino testified to the jury that he spoke to Maritza at least three times on the telephone. She was consistently argumentative and uncooperative. But she also refused to give a statement over the telephone or in person. Aquino testified that Maritza "would not talk to me about the incident at all" and "didn't want to talk to me about anything at all." In one conversation, she agreed to come in at a later date, but never did.

14

No objection was made to the testimony indicating Maritza had refused to give a statement.

On cross-examination, Maritza's counsel asked: ". . . Are you aware of any rule that says someone has to come in and talk to the police?" Detective Aquino conceded he was not. However, in response to defense counsel's follow-up question of whether Aquino considered someone not coming in to talk to him uncooperative, Aquino replied, "when I'm talking about a violent offense, I would assume that people would be cooperative if -- if they're going to help me do my job. And if someone is not willing to cooperate with me, yeah, I consider that uncooperative, and not really something a good person would want to come do."

Although Maritza asserts no error related to the prosecutor's closing argument, we note that the prosecutor argued Maritza's conduct could be considered evidence of consciousness of guilt.[11] However, the trial court's instructions did not reference Maritza's lack of cooperation as potential consciousness of guilt evidence.

In his closing argument, Maritza's counsel said: "Well, this is probably not the forum to get into why it's not a good idea to cooperate with the police all the time. But sometimes it's in a person's best interest . . . . You know, Maritza is a suspect . . . . I don't think it's consciousness of guilt not to go in and talk to Officer Aquino. I think it's prudent behavior. And smart. But, then, again, I'm a defense attorney."

Maritza asserts in her briefing: (1) Detective Aquino's testimony had no probative value and could only have biased the jury emotionally against her, and (2) the admission

_____

[11]  After arguing flight was evidence that defendants "knew that they did something wrong," the prosecutor said, "It's the same reason why Maritza Ramos refused to cooperate with the investigation by Officer Aquino. . . . She didn't want anything to do with th[e] investigation. . . . [¶] [S]he didn't want anything to do with it. And that's because she knew that she had -- she wanted no contact with the police in this investigation because she knew she was responsible for what happened." No objection was made to this argument.

15

of this testimony flouted "the policies behind" *Griffin v. California* (1965) 380 U.S. 609 [14 L.Ed.2d 106], which held that the use of a defendant's refusal to testify at trial against him violates the Fifth Amendment.

Without conceding a Fifth Amendment violation, the People commendably cite an appellate decision not cited by Maritza in her opening brief, which held that substantive use of precustody/pre-*Miranda* silence in the prosecution's case-in-chief may violate the Fifth Amendment. (*People v. Waldie* (2009) 173 Cal.App.4th 358, 365-366 (*Waldie*).)[12] In *Waldie*, a detective was allowed to testify in the prosecution's case-in-chief that the defendant never participated in a police interview, even after a dozen phone calls. The trial court instructed the jury that defendant's statement promising to call back tended to show consciousness of guilt. In closing argument, the prosecutor commented that the defendant did not cooperate with the police investigation. (*Waldie*, *supra*, 173 Cal.App.4th at p.364.)

Unlike in *Waldie*, defendant here did not simply miss appointments; nor did she simply remain silent. When asked to submit to an interview, she told the investigator she did not want to talk about what had happened and refused to give a statement in person or over the telephone. At oral argument, both parties agreed that Maritza expressly invoked her right to remain silent. The concession by the People was appropriate. The Fifth Amendment provides in pertinent part, "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." By refusing to talk, defendant invoked this right. A defendant need not be in custody or Mirandized to invoke the right against self-incrimination. The right to remain silent derives from the Constitution, not from the *Miranda* warnings themselves. (*United States v. Velarde-Gomez* (9th Cir. 2001) 269 F.3d 1023, 1030.) That right can be invoked any time. And "a person's invocation

---

**12** In her reply brief, Maritza fully embraces *Waldie* and urges us to apply it here.

16

of his or her right to remain silent cannot be used as evidence of guilt." (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1525 [colorful post-*Miranda* invocation was erroneously admitted].)

While there appear to be no published California cases involving use in the prosecution's case-in-chief of precustody/pre-*Miranda* words that effectively invoke the right to remain silent,[13] there are federal cases that prohibit such evidence. (*Coppola v. Powell* (1st Cir. 1989) 878 F.2d 1562, 1563, 1565 [right against self-incrimination attaches precustody/pre-*Miranda*, making the following express refusal to speak inadmissible: " 'Let me tell you something. I'm not one of your country bumpkins. I grew up on the streets of Providence, Rhode Island. And if you think I'm going to confess to you, you're crazy"]; *U. S. ex rel. Savory v. Lane* (7th Cir. 1987) 832 F.2d 1011, 1015-1018; see *id.* at p. 1015 [admission of defendant's precustody/pre-*Miranda* statement " 'he didn't want to talk about it, he didn't want to make any statements' " violated right against self-incrimination].) And where precustody silence is used for impeachment purposes, California courts have held such impeachment is impermissible if the trial court finds the silence was an invocation of Fifth Amendment rights. (*People v. Givans* (1985) 166 Cal.App.3d 793, 801; *People v. Free* (1982) 131 Cal.App.3d 155, 166.) At a minimum, the same rule should apply to substantive use of precustody/pre-*Miranda* silence in the prosecution's case-in-chief.

Here, Maritza said she did not want to talk to Detective Aquino, thus invoking her Fifth Amendment rights.

---

[13] We note that the issue of whether the prosecution can use postcustody/pre-*Miranda* silence in their case-in-chief -- an issue on which the federal circuits are split -- is currently before the California Supreme Court. (*People v. Tom* (2012) 204 Cal.App.4th 480, review granted June 20, 2012, S202107.)

However, Maritza did not object to the evidence that she expressly invoked her right to remain silent. She objected on relevance and Evidence Code section 352 grounds to evidence that defendant "broke appointments" and "did not show up," contending that conduct was an "indication of her *knowledge* of her right not to speak to the police officer, not to report any crimes, to exercise her Fifth Amendment right to not provide any testimony against herself should her statements ever be used against her." (Italics added.)

Maritza contended at oral argument that trial counsel's generic reference to the Fifth Amendment was sufficient to preserve an argument that she expressly invoked her right to remain silent. We disagree. A generic objection on Fifth Amendment grounds is insufficient. Like any objection, a defendant must state in the trial court the *specific grounds* for an objection to the admissibility of her statements. (*People v. Tully* (2012) 54 Cal.4th 952, 992 [objection on grounds that the defendant invoked his right to counsel does not preserve an objection that the statement was involuntary]; *People v. Rundle* (2008) 43 Cal.4th 76, 115-116, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [generic motion to suppress statements made to police without stating specific grounds does not preserve claim that defendant invoked his right to remain silent; *Rundle*, *supra*, 43 Cal.4th at pp. 120-121 [contention on appeal that statements made to psychiatrist were involuntary and his *Miranda* waiver was invalid were not preserved by objection grounded on claims defendant invoked his right to remain silent in a prior police interview and invoked his right to counsel during the interview with the psychiatrist]; see *id.* at pp. 122-123 [additional theory of involuntariness grounded on claim related to the " 'extensiveness of the interrogations' " was not preserved because defendant also failed to assert this ground in the trial court].)

At oral argument, counsel for Maritza contended that *People v. Partida* (2005) 37 Cal.4th 428 provides a theory by which a contention that she expressly invoked her right to silence could be preserved. *Partida* is of no help to Maritza.

18

Our high court in *Partida* emphasized the well-settled rule that a defendant may not argue on appeal that the trial court should have excluded the evidence for a reason *not* asserted at trial.  (*Partida*, *supra*, 37 Cal.4th at pp. 431, 433-434.)  A specific objection is required so that the trial court has " 'a concrete legal proposition to pass on' " (*Partida*, *supra*, 37 Cal.4th at p. 434) and "[a] party cannot argue the [trial] court erred in failing to conduct an analysis it was not asked to conduct" (*id*. at p. 435; accord, *People v. Holford* (2012) 203 Cal.App.4th 155, 169).  Thus, the *Partida* rule can apply only when " 'the new arguments do not invoke facts or legal standards different from those the trial court itself was asked to apply[.]" (*People v. Homick* (2012) 55 Cal.4th 816, 856, fn. 25, quoting *People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17.)  Deciding whether precustody/pre-*Miranda* silence violates the Fifth Amendment requires the application of different legal principles than deciding whether there has been an express invocation of the right to remain silent.  Indeed, as *Waldie* illustrates, the legal principles related to precustody/pre-Miranda silence are not settled and may require a case-by-case analysis of a variety of facts. (See fn. 14, *post*.)  Moreover, facts different from those presented to the trial court before its ruling are implicated in the invocation theory and Maritza suggests we should find error based on evidence the trial court was never ask to exclude.  "When a trial court rules on an objection to evidence, it decides only whether that *particular evidence* should be excluded." (*Partida*, *supra*, 37 Cal.4th at p. 436, italics added.)

As we have noted, when defendant's midtrial objection was argued, the trial court was not told what specific responses Maritza made to Aquino's requests or questions.  Indeed, defense counsel made the offer of proof as to what Aquino would say about defendant's failure to interview with him and the court made its ruling based on that proffer.  We must assess the trial court's ruling refusing to preclude evidence based on the facts made known to the court when it was asked to make the ruling.  (*People v. Hartsch* (2010) 49 Cal.4th 472, 491; *People v. Hernandez* (1999) 71 Cal.App.4th 417,

19

425.) "To do otherwise would require us to hold the trial court to an impossible standard." (*Hernandez*, *supra*, 71 Cal.App.4th at p. 425.) Defendant did not object when Aquino testified to Maritza's express refusal to talk about what had happened. To preserve any objection to the evidence based on a deviation from the offer of proof, it was incumbent upon defendant to object at the time the evidence was introduced. (*People v. Champion* (1995) 9 Cal.4th 879, 919 [by failing to object at trial, defendant forfeits objection to the prosecution's trial evidence that did not conform to the prosecution's pretrial offer of proof upon which the trial court based its ruling].) Consequently, we must regard any objection that Maritza expressly invoked her right to remain silent as forfeited.

That said, defendant's contention that the trial court erred by refusing to preclude evidence of her failure to keep interview appointments with Aquino was adequately preserved. Without deciding defendant's Evidence Code section 352 argument or agreeing with the analysis related to precustody/pre-*Miranda* silence in *Waldie*,[14] we conclude any error in admitting Aquino's testimony was harmless.

_____

[14] The *Waldie* court noted a split of authority in the federal circuits, some of which have concluded that substantive use of precustody silence (as opposed to an express invocation) by the prosecution is constitutional. While these cases were rejected in *Waldie* (*Waldie*, *supra*, 173 Cal.App.4th at pp. 365-366), the *Waldie* court's holding appears to provide less than a bright line and seems to allow for the use of precustody silence in some situations. The *Waldie* court noted that its conclusion was "based on the particular circumstances" of that case. (*Waldie*, *supra*, 173 Cal.App.4th at p. 364.) Then the court discussed those circumstances. "Here, the . . . detective testified that defendant did not follow up on his promise to call when the detective was attempting to investigate the case. But the detective went beyond saying the defendant did not call him back. In fact, the detective described *repeated attempts to contact defendant--more than a dozen times--making it appear that defendant was evading the police*. The prosecutor also placed emphasis on defendant's continuing failure to call the police. We conclude the evidence and argument violated the Fifth Amendment because defendant was deprived of any meaningful right to refuse to talk to the police. If the police are allowed to call a suspect persistently and then offer his unwillingness to

20

In *Waldie*, the court found the error there harmless beyond a reasonable doubt under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] because the properly admitted evidence against the defendant was extremely strong. (*Waldie*, *supra*, 173 Cal.App.4th at pp. 366-367.) Likewise, the evidence of Maritza's guilt as an aider and abettor was overwhelming. As we have discussed in the unpublished portion of this opinion, the evidence established that Maritza was angry that her birthday party had been ruined. She had been disrespected, thrown off the bus, and stranded in San Francisco. Thus, she had a strong motive to aid and abet the armed perpetrators of the assault. The evidence supports the inference that she instigated the mob and led them in the assault. She and her sister were dressed for the battle. With a vindictive expression on her face, she led two of the armed assailants to the right side of the bus where passengers exited. The mob allowed Maritza's friends to escape and targeted specific individuals who had "fucked with" and stranded Maritza. Maritza told Karina and Chavez it was time to go when it became known that the police were coming, and they all then fled.

Further, we observe that, unlike *Waldie*, the trial court did not instruct the jury that Maritza's prearrest conduct could be considered evidence of consciousness of guilt.

We conclude any error here was harmless beyond a reasonable doubt.

## B. Evidence of Arrest Warrant

Outside the jury's presence, the prosecutor told the court he intended to ask Detective Aquino whether and when he had had warrants issued for defendants' arrest. Maritza's counsel objected that this evidence was irrelevant. The prosecutor explained

---

respond as evidence of guilt, a defendant would never be able to claim the protection of freedom from incrimination. *A different result might be indicated if the detective had called defendant only one time or a few times. But testimony about repeated phone calls and apparent evasiveness by defendant is constitutionally infirm*." (*Waldie*, *supra*, at p. 366, italics added.) Because we decide any error is harmless, we need not endorse the *Waldie* analysis or decide whether the trial court's ruling concerning the precustody/pre-*Miranda* silence here was admissible on the theory that the detective called only "a few times."

that he wanted to show the length of the investigation to show how long Maritza had failed to cooperate.

The trial court ruled: ". . . As I understand it, I think it is relevant. I understand it. His theory is that [Maritza] was uncooperative, and that she had until this date [the date of her arrest] to cooperate, and she failed to do so." Counsel repeated his relevance objection "to preserve the record." The court overruled the objection.

Detective Aquino thereafter testified that, after his unsuccessful attempts to obtain a statement from Maritza, an arrest warrant was issued for her sometime during the first half of December.[15]

Maritza asserts that this evidence had no tendency in reason to prove any disputed fact of consequence, and that the prosecution introduced it in an improper "effort to imply or suggest to the jurors that [Maritza] had a greater obligation to talk to the police because she had not yet been arrested." The relevance of this evidence is tied to defendant's refusal to give a statement. In essence, the prosecutor sought to establish the length of Maritza's precustody silence. We conclude that any error in admitting this evidence was harmless beyond a reasonable doubt given the compelling evidence we have already discussed.

## DISPOSITION

The judgment is affirmed.

<u>      MURRAY      </u>, J.

We concur:

---

[15] Although Maritza contends the court erroneously admitted evidence of the date of her arrest, the prosecutor did not actually ask Aquino about that date and no evidence of the date was admitted. The prosecutor only asked about when an arrest warrant was issued.

22

_____RAYE_____, P. J.


_____HOCH_____, J.