Filed 3/10/15  P. v. Mackey CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C073310 |
| Plaintiff and Respondent, | (Super. Ct. No. SF121306B) |
| v. | |
| PARIS MACKEY, | |
| Defendant and Appellant. | |

A jury found defendant Paris Mackey guilty of two counts of second degree robbery (Pen. Code,[1] § 211) and found that he personally used a firearm (§ 12022.53, subd. (b)) in the commission of each count.  After his new trial motion based on prosecutorial misconduct and insufficiency of evidence was denied, defendant was sentenced to prison for an aggregate term of 13 years, which included a consecutive term of 10 years for the firearm use enhancement.

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of the charged offenses.

1

On appeal, defendant contends (1) the prosecutor violated his privilege against self-incrimination and his due process rights during opening summation when he commented on defendant's post-arrest/post-*Miranda*[2] silence, and (2) the firearm enhancement is not supported by substantial evidence.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Case-in-Chief

Around noon on August 16, 2012, loss prevention officers Michael Miller and Damion Wilke were walking around a Save-Mart grocery store together pretending to be shoppers when they saw three men enter and walk to a coin redemption machine. At trial, Miller and Wilke identified defendant and codefendant Shaquille Anderson as two of the men. In his testimony, defendant identified the third man as someone named Donovan Rhodes.[3]

Defendant began depositing coins into the redemption machine. As he did so, a store clerk opened a safe that was located near the trio. Wilke, who was about six feet away, heard one of the men say, in evident reference to the clerk, " 'We should get him. We should get him.' " Miller heard the trio discussing planning on possibly robbing the store later while the store clerk opened the safe and specifically heard two of the men use the word "rob" during the conversation. Wilke did not remember defendant saying anything about robbing the store during this conversation. Miller later told the police that

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

[3] The reporter's transcript of defendant's testimony refers to the third man as Donovan Rose. The clerk's and reporter's transcripts later refer to the man as Donovan Rhodes.

Miller, Wilke, and the prosecutor referred to this man variously as "third male" or some similar term. We express no opinion about the credibility of defendant's identification, but for convenience, we will refer to the third individual as "Rhodes" when discussing the testimony of Miller and Wilke.

2

defendant said, " ' "We should get this store," ' " and Rhodes said, " ' "No, we'll get it the next time." ' "

The head clerk, who had opened a nearby safe just before one of the three said the words, " 'We should get him,' " closed the safe and walked away without taking money from the safe. Wilke described the clerk as appearing "real nervous" when he left the safe.

Anderson then left defendant and Rhodes at the redemption machine and went to the restroom. When Anderson returned, all three men walked to the check stand so defendant could obtain cash for his coins.

Anderson and Rhodes left defendant at the check stand and walked off toward the general merchandise aisle. Miller and Wilke saw Anderson select a package of socks, open the package, and hand a pair of socks to Rhodes who put them in his pocket. Anderson put the other pair of socks from the package into his own pocket. After concealing the socks, Anderson and Rhodes returned to the check stand where defendant was and waited with him. After defendant obtained cash for his coins, the three men left the supermarket together.

Miller and Wilke followed the trio and attempted to stop Anderson and Rhodes soon after they left the store. They were not trying to stop defendant because they had not seen him do anything. Miller and Wilke identified themselves verbally and visually to the men as loss prevention officers and asked them about the socks. When confronted, all three men began talking in loud, angry voices and denied that they had any socks.

Defendant began walking toward a black, four-door sport utility vehicle (SUV) and his companions followed. Defendant unlocked the SUV with a remote, sat in the driver's seat, and started the vehicle. Anderson jumped into the front passenger seat and shut the door. Rhodes opened the driver's side rear door and leaned inside.

According to Wilke, he and Miller were located approximately two to three feet from the SUV on the driver's side. Miller said he was on the driver's side, but said he

3

was further back towards the back of the SUV. Both saw defendant bend over, reach under the driver seat, and pull out a small black revolver. Miller and Wilke then saw defendant reach between the driver's seat and the front passenger seat and hand the gun to Rhodes, who was at the driver's side rear door, leaning into the vehicle. Miller saw that it was a gun as soon as defendant pulled it out from under the seat. Upon seeing defendant pull out an object from under the seat, Wilke started backing up slowly, and he started backing up "even more" when he saw that it was a gun and that defendant was handing it to Rhodes.

After taking the gun from defendant, Rhodes turned and pointed the gun directly at both loss prevention officers. Wilke testified that Rhodes told them, " 'I have the socks. I don't give a fuck. You can fuck Save-Mart, fuck all your stuff inside there and call the fucking cops. *We're* not scared.' " (Italics added.) Similarly, Miller testified that Rhodes said they had taken the socks and asked the two loss prevention officers what they were going to do about it. Miller and Wilke backed away as Rhodes pointed the gun at them. Rhodes then entered the SUV, and defendant drove the vehicle out of the parking lot.

After the SUV departed, Miller and Wilke telephoned 911 and reported the incident. Defendant and Anderson were arrested the next day at defendant's home.

**Defense Case**

Defendant testified that around noon on August 16, 2012, he drove a black SUV to the Save-Mart supermarket accompanied by Anderson and Rhodes. Rhodes had called defendant earlier requesting a ride to the downtown transit center. Defendant went to the supermarket to deposit coins in the store's coin redemption machine. He testified that while the other two were with him at the coin machine, he did not speak to them and was unaware of what they were saying because the coin machine was noisy. After the coins were deposited, defendant and his companions got in line at a check stand. While

4

defendant waited, the companions ventured around the store. After defendant received his money, all three of them left the supermarket.

As the trio left the supermarket, the loss prevention officers approached them and asked about some socks. Defendant put up his hands and asked, " 'What socks?' " When he realized the officers were not speaking to him, defendant walked to the SUV, unlocked the door with his remote, sat in the driver's seat, and started the engine. Defendant looked in his rearview mirror and saw Rhodes holding a black semi-automatic handgun in his outstretched hand. Defendant got out of the car, pulled down Rhodes's outstretched hand, and told him, " 'You're stupid.' "

Defendant and Rhodes reentered the SUV and defendant drove away from the supermarket. Defendant dropped off Rhodes at the transit center downtown. Defendant testified that he never pulled a gun from underneath his seat and never handed a gun to Rhodes.

Defendant testified that he did not "need to steal from" the supermarket because he "[has] a job" and "had money on [him] that day."

Throughout his direct examination, defendant referred to Rhodes as the "third person" or some similar term. It was on cross-examination by the prosecution when defendant was asked the name of the third person and he identified Rhodes by name. In response to the final cross-examination questions from the prosecutor, defendant admitted that when he left the store, he did not call 911 or report to the police what Rhodes had done.

## DISCUSSION

### I. Prosecutorial Misconduct

Defendant contends the prosecutor violated his privilege against self-incrimination and his right to due process when, during his opening summation, he commented on defendant's post-arrest/post-*Miranda* silence to prove his guilt. He argues (1) the

5

prosecutor's comment on his post-arrest/post-*Miranda* silence constituted *Doyle* error,[4] and (2) the prosecutor actively misled the jury into believing that defendant had not tried to speak to police about the third male, even though the prosecutor knew defendant had tried to do so. Defendant claims the prosecutor's remarks were prejudicial and require reversal.

We agree that a portion of the prosecutor's closing argument was a comment on defendant's post-arrest/post-*Miranda* silence and constituted *Doyle* error, but conclude that the comment was harmless beyond a reasonable doubt.

## A. Background

In his opening summation, the prosecutor argued: "[Defendant] said [Rhodes is] responsible for this whole robbery, a guy who's not here. He would have been a nice witness to hear from if the defense would have brought him in and had him testify. . . . [¶] If [defendant is] to be believed, he's a hero. He stopped this guy that he knew from high school that he was giving a ride to that he took to this location, he stopped him from putting Mr. Miller and Mr. Wilke's life in jeopardy. Is that realistic? Is that believable? Does that make sense based upon what we just heard? [¶] He didn't call [911]. He didn't report this Mr. [Rhodes]. *He tossed out his name here for the first time in a way that nobody can verify anything about his story*." (Italics added.)

Defendant's trial counsel objected and asked to approach. The ensuing bench conference and a chambers session were not reported. Following the chambers session, the trial court stated that the objection was overruled without elaboration.

In a written new trial motion, defendant argued that the prosecutor's arguments "were prejudicial and unfair in two ways. First, the prosecutor directly commented on the defendant's right to remain silent. By arguing to the jury that this was the first time

---

[4] *Doyle v. Ohio* (1976) 426 U.S. 610 [49 L.Ed.2d 91] (*Doyle*).

6

the defendant's version of events had been told, he was implying to the jury that if the defendant's version were true, he would have make [*sic*] it known at an earlier time." Defendant further argued that "[t]he second way this prejudiced the defendant was the argument misled the jury. The prosecution knew that the defendant on several occasions attempted to disclose the unknown third person and the circumstances around the incident. Yet, during closing, it was argued by the prosecution that the identification of the third person and the sequence of events as told by the defendant were all new information and being heard for the first time. However, the prosecutor knew while making that argument that [defendant] had offered months before to disclose that information [to] him. The prosecutor declined to listen to what [defendant] had to offer. It is disingenuous to argue to the jury that this is all new information regarding the third person's identity."

In his opposition to the motion, the prosecutor noted that on the day after the robbery, defendant had been arrested on two unrelated matters. Rather than "invoke his right to remain silent on the other two cases," defendant "waived his right to remain silent and gave an interview to the police." Defendant "was never interviewed regarding [this] robbery case."

The prosecutor also asserted, "The defense argument that his client had attempted to provide the name of the accomplice Rhodes, misstates the facts and negotiations. The defense attorney stated his client would provide the name of the third accomplice if he received **probation** but wouldn't 'snitch' if he had to go to prison. . . . The defendant refused the 5 year prison offer and never provided the name."

At the hearing on the motion, the prosecutor noted that "at the time the defendant objected, he conceded that [he] had never invoked his right to remain silent on this case. In fact, he was -- when he was interviewed by the police, it was about his two other cases. He freely gave a statement. He wasn't interviewed on this case. I don't think that the Doyle line of cases apply." The prosecutor further argued, "What my argument referred

7

to was the defendant's testimony, the fact that he claimed he was trying to stop a robbery. It didn't make sense in light of the other facts.  So the People were commenting on both his testimony and failure to call logical witnesses, specifically the other individual, Donovan Rhodes.  It has nothing to do with any post-arrest silence in this case, because there was none."

## B.  Forfeiture

" ' "[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]" ' [Citation.]  Objection may be excused if it would have been futile or an admonition would not have cured the harm.  [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 760 (*Dykes*).)  The forfeiture rule applies to *Doyle* violation claims. (*People v. Tate* (2010) 49 Cal.4th 635, 691-692 (*Tate*).)

The People concede that defense counsel made a timely objection, but they claim he (1) did not specify the grounds for the objection, and (2) did not request an admonition.  The People's claim is based on the reporter's transcript of the objection, which shows only that an objection was considered in unreported bench and chambers conferences and then overruled without argument on-the-record by the parties or elaboration by the trial court.  Defense counsel never mentioned the specific grounds for the objection on-the-record, even at a later time outside the presence of the jury.

However, in the new trial motion, defense counsel recounted what had occurred during the unreported chambers conference.  He asserted that he had objected on the ground that the prosecutor's argument was a comment on defendant's constitutional right to remain silent.  He also said counsel for the codefendant objected during the chambers conference on the ground that the prosecutor's argument was disingenuous because defendant had offered to give the identity of the third person during plea negotiations.

8

However, counsel for defendant never stated he asserted that ground during the chambers conference or joined in the objection registered by counsel for the codefendant.

During argument on the new trial motion, defendant's counsel stated: "The court . . . recalls I made an objection. We went into chambers and discussed some things. I don't think we fully put on the record the reason for my objection, but we did have some discussions in chambers. And the point of my objection was that I believed it was unfair for the People to essentially argue to the jury that this was the first time the defendant had come forward with this information. Essentially, what I believe the People were doing at that point were *commenting on his . . . post-arrest silence, Judge, when he was arrested, not coming forward and informing the officers of his version of the story*." (Italics added.) The prosecution did not dispute defense counsel's representation of the trial objection. Thus, the record discloses that defense counsel had objected during the trial on the ground that the prosecutor's comment on defendant's post-arrest silence violated defendant's right to remain silent.

The record does not show, however, that counsel for defendant objected at trial on the ground that the prosecutor's argument was disingenuous because defendant had offered to provide the name of the third person prior to trial. As counsel for defendant noted in his written motion for new trial, it was counsel for the codefendant that made that objection during the unreported chambers conference, and there is no indication that counsel for defendant joined in that objection. Nor did counsel for defendant argue that objection during the hearing on the new trial motion. We conclude that contention is forfeited. (See *Dykes*, *supra*, 46 Cal.4th at p. 760.)

### C. *Doyle* Error

#### 1. *Doyle* Analysis

It is prosecutorial misconduct to comment on a defendant's post-arrest silence following *Miranda* warnings. (*People v. Collins* (2010) 49 Cal.4th 175, 203, citing *Doyle*, *supra*, 426 U.S. at pp. 617-618.) The high court in *Doyle* explained: "The

9

warnings mandated by [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, [citation], require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation.  Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights.  Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested.  [Citation.]  Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings.  In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." (*Doyle*, at p. 618.)

As noted, the prosecutor argued to the jury that defendant "tossed out his name here for the first time in a way that nobody can verify anything about his story."  This argument in effect covered defendant's silence during four points in time:  (1) silence before defendant's arrest (pre-arrest/pre-*Miranda*); (2) silence after his arrest, but before he was given the *Miranda* admonitions (post-arrest/pre-*Miranda*); (3) silence after he was given the *Miranda* admonitions prior to arraignment (post-arrest/post-*Miranda*); and (4) silence after arraignment all the way up until the time he testified (post-arraignment).[5]

---

[5] Trial courts advise defendants of the constitutional right to remain silent and the right to counsel at arraignment, thus reinforcing the admonitions given as part of a *Miranda* warning and the silence inducing effects of such warnings.  However, defendant did not object in the trial court on the ground that the prosecutor's argument commented on post-arraignment silence and he does not make that argument on appeal.  As noted, *ante*, defense counsel summarized the objection he made during trial to include "post-arrest silence . . . when he was arrested, not coming forward and informing the officers of his version of the story."  Any claim related to post-arraignment silence is forfeited.  (See *Tate*, *supra*, 49 Cal.4th at pp. 691-692 [*Doyle* violation forfeited]; see also *People v. Ramos* (2013) 216 Cal.App.4th 195, 206-209 [generic Fifth Amendment objection is

It was not improper for the prosecutor to comment on defendant's pre-arrest/pre-*Miranda* silence. (*Jenkins v. Anderson* (1980) 447 U.S. 231, 238, 240-241 [65 L.Ed.2d 86, 96].) This is because when the failure to speak occurs before a defendant is taken into custody and given *Miranda* warnings, the silence is not induced by governmental action. (*Id.* at p. 240.) *Doyle* applies where the government induces silence by implicitly assuring the defendant that his silence will not be used against him. (*Fletcher v. Weir* (1982) 455 U.S. 603, 606 [71 L.Ed.2d 490, 494] (*Fletcher*).) Thus, the prosecutor's cross-examination questions about failing to call 911 and failing to report Rhodes after defendant left the store and his closing argument comment that defendant "didn't call [911]" and "didn't report this Mr. [Rhodes]," to the extent those comments related to pre-arrest/pre-*Miranda* silence, were not improper. Moreover, in the context of this case, it would not have been improper to comment on defendant's failure to report Rhodes post-arrest/pre-*Miranda* -- during the time period after he was arrested, before he was *Mirandized*. (*Id.* at p. 607.) In holding that post-arrest/pre-*Miranda* silence is fair game, the high court in *Fletche*r said, "In the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand." (*Ibid.*; see also *People v. Tom* (2014) 59 Cal.4th 1210, 1223, 1230-1231 ["The prosecution may use a defendant's pretrial silence as impeachment, provided the defendant has not yet been *Mirandized*"; "[w]here a defendant could have invoked his privilege against self-incrimination at any point—but failed to do so—the prosecution's use in its case-in-chief of the defendant's postarrest, pre-*Miranda* silence in the absence of interrogation cannot be deemed a 'penalty . . . for exercising a constitutional privilege' "].)

---

insufficient to preserve objection to prosecutor's comment about a pre-arrest/pre-*Miranda* express invocation of the right to remain silent].)

However, defendant complains that the prosecutor's comments implicated his silence post-arrest/post-*Miranda*.  We agree.  The prosecutor's comment, "He tossed out his name here for the first time in a way that nobody can verify anything about his story" is a comment about defendant's silence post-arrest/post-*Miranda*.

The People point out that defendant was not arrested on the instant case, but rather he was arrested on unrelated cases.  He was given *Miranda* admonitions, waived his right to remain silent, talked to the officers about those other cases, and was never interviewed about the instant case.  The People, however, do not explain why these circumstances make the prosecutor's comments about defendant's post-arrest/post-*Miranda* silence permissible.  The fact that defendant was not questioned about this case after his arrest, but rather was *Mirandized* and questioned about other cases, does not nullify the silence inducing effect the *Miranda* admonitions had relative to any past criminal activity.  Nor is an invocation required to trigger *Doyle* post-arrest/post-*Miranda*.  All that is required is "the sort of affirmative assurances embodied in the *Miranda* warnings."  (*Fletcher*, *supra*, 455 U.S. at p. 607; accord, *Salinas v. Texas* (2013) ___ U.S. ___ [186 L.Ed.2d 376, 387, fn. 3] [noting that "*due process* prohibits prosecutors from pointing to the fact that a defendant was silent *after he heard Miranda* warnings, [citation], but that rule does not apply where a suspect has not received the warnings' implicit promise that any silence will not be used against him"], first italics in original, second italics added.)  Not talking about past events other than the matters about which defendant was interrogated may have been the result of the *Miranda* admonitions -- you have the right to remain silent, *anything* you say may be used against you and you do not have to talk without a lawyer.  Thus, the government inducement to remain silent upon which *Doyle* is based is present here, notwithstanding that defendant was never questioned about this case.

The People contend that the prosecutor did not comment on defendant's post-arrest silence.  Rather, citing *People v. Champion* (2005) 134 Cal.App.4th 1440, the People contend the prosecutor simply commented on defendant's failure to call logical

12

witnesses. *Champion* does not advance the People's contention here. In *Champion*, the defendant invoked his right to remain silent during police questioning, but at trial, he testified he was not given an opportunity to tell his side of the story. (*Id*. at pp. 1445-1446, 1448, 1450.) Over defendant's objection, the trial court permitted the prosecution to introduce rebuttal evidence that, during defendant's police interrogation, he was given an opportunity to make a statement but he refused.[6] (*Id.* at p. 1445.) The *Champion* court held that the prosecutor's reference to defendant's refusal to speak with the police was a fair response to defendant's claim that he was not given the opportunity to tell his side of the story. (*Id.* at p. 1443.) Here, however, defendant never testified that no one would listen to him or that he was not given an opportunity to tell his side of the story. Thus, highlighting defendant's failure to tell anyone about Rhodes until trial was not a fair comment under *Champion*.

The prosecutor did say, "[Defendant] said [Rhodes is] responsible for this whole robbery, a guy who's not here. He would have been a nice witness to hear from if the defense would have brought him in and had him testify." That comment does reference defendant's failure to call witnesses,[7] but that is not all the prosecutor said. The

---

[6] The trial court in *Champion* also gave a limiting instruction, in which the jury was told: " '[Y]ou may consider the evidence that the defendant was offered a chance to tell his side of the story by the police for the limited purpose of showing defendant's credibility. However, since the defendant had a constitutional right to remain silent when contacted by the police, the fact that he exercised that right and declined to speak is not to be held against him in any way, and may not be used to infer whether he's guilty or not guilty. [¶] Do not consider the evidence of the defendant being offered the chance to tell his side of the story to the police and the fact that he declined to do so for any purpose, except the limited purpose for which it was admitted.' " (*Champion*, *supra*, 143 Cal.App.4th at p. 1447.)

[7] Nothing we say should be construed to sanction comment about the failure to call a witness who is likely to invoke his own right against self-incrimination. We note the People have cited no authority supporting the propriety of such comment, but do not decide that issue here.

prosecutor's argument that defendant "tossed out" Rhodes' name for the first time at trial was a comment that highlighted defendant's silence as to the identity of the third person after defendant was arrested, post-*Miranda*.

We conclude that the prosecutor's comment about defendant implicating Rhodes for the first time at trial violated defendant's right to remain silent and due process.

### 2. Harmless Error

The prosecutor's error here is subject to harmless error review under the *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711], beyond a reasonable doubt standard for assessing prejudice. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.) That inquiry requires us to ask "whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' [Citation.]" (*Yates v. Evatt* (1991) 500 U.S. 391, 403 [114 L.Ed.2d 432, 448].) A reviewing court conducting a *Chapman* harmless error analysis "looks to the 'whole record' to evaluate the error's effect on the jury's verdict." (*People v. Aranda* (2012) 55 Cal.4th 342, 367.) Looking at the record as a whole, we conclude beyond a reasonable doubt that the error here did not contribute to the verdict.

First, we look to the strength of the evidence against defendant. It is without dispute that defendant accompanied two individuals into the store who thereafter stole property and then led both of them to his vehicle, unlocked the doors, turned on the engine, and drove both individuals away after a gun was used to prevent loss prevention from interceding in the theft. Additionally, the evidence established that shortly after the trio entered the store at least two people in the group were overheard saying, " 'We should get him,' " and talking about robbing the store. It was apparent that the statement, " 'We should get him,' " referred to the store clerk who had opened a nearby safe and that the comment was said loud enough to be heard by the clerk, because the clerk closed the safe and left nervously, without obtaining money from the safe. Defendant's self-serving testimony that he did not hear what the other two were talking about while he

14

deposited his coins did not square with this reaction by the clerk who the evidence indicates was able to hear what was said. From this conversation, it can be inferred that the group was not just three individuals acting independently, but rather they acted in concert with each other when later approached by the loss prevention officers.

After the two loss prevention officers confronted the group about the socks Anderson and Rhodes had taken, both officers observed defendant remove a revolver from under the driver seat where he was sitting and hand it to Rhodes. Rhodes then pointed the gun he had been handed by defendant at the officers. As soon as Rhodes got back in the SUV, defendant drove the trio away. This testimony was compelling and established defendant's guilt beyond a reasonable doubt.

As defendant points out, his testimony was in "stark contrast" with that of the two loss prevention officers. The contrast was too stark to be believable. For example, defendant claims he got out of the vehicle, went to Rhodes and made Rhodes lower the gun. But neither loss prevention officer said defendant got out of the SUV while Rhodes pointed the revolver at them. Neither said defendant interceded in any way. And neither had any motive to omit this from their testimony, especially since it was Rhodes and Anderson who took the socks and the officers had no intent to stop defendant. Moreover, defendant described nothing in the scenario that might have suggested the officers were mistaken about what defendant was doing when they saw him bending over, reaching under the seat, pulling at a revolver, and handing it to Rhodes, who was at that time leaning into the SUV.

Defendant points to inconsistencies between the testimony of each officer regarding specifically where they were when defendant handed Rhodes the gun, what hand defendant used to pull the revolver out from under the driver's seat, and what hand he used to hand it to Rhodes. These minor inconsistencies in describing a rapidly evolving, dynamic situation are immaterial.

15

Next we look to the nature of the constitutional violation. In his final cross-examination questions, the prosecutor got defendant to admit he did not call 911 or report Rhodes after he left the store. Later, during closing argument, the prosecutor reminded the jury that defendant failed to call 911 or report Rhodes. Defendant acknowledges that this argument was proper because it "undercut [defendant's] testimony that he was not criminally involved, but rather Rhodes had alone committed the crimes." Thus, defendant's credibility was severely damaged by his failure to contact the police after the robbery before he was ever arrested and *Mirandized*. A jury could reasonably infer that that silence spoke volumes about the credibility of his trial testimony that Rhodes was acting alone. Indeed, that defendant did not report Rhodes immediately after he dropped off Rhodes at the transit center was a much greater hit to the credibility of defendant's trial testimony than his failure to mention Rhodes and the incident at the grocery store after he had been arrested.

Given the trial evidence establishing defendant's guilt, his failure to report Rhodes at any point before he was arrested, and the impact his pre-arrest silence had on the credibility of his trial testimony, we conclude beyond a reasonable doubt that the prosecutor's additional comment about defendant's post-arrest/post-*Miranda* silence did not contribute to the guilty verdict.

## II. Evidence of Firearm Use

Defendant contends there was insufficient evidence to sustain the jury's finding that he " 'used' " a firearm within the meaning of section 12022.53, subdivision (b). He claims the evidence was insufficient because there is no evidence he displayed or used the weapon in any menacing manner. He further claims he did not deliberately show the

16

gun because purportedly neither loss prevention officer could see the gun until they saw defendant hand the gun to Rhodes.**8**  These claims have no merit.

"On appeal, the test of legal sufficiency is whether there is substantial evidence, i.e., evidence from which a reasonable trier of fact could conclude that the prosecution sustained its burden of proof beyond a reasonable doubt.  [Citations.]  Evidence meeting this standard satisfies constitutional due process and reliability concerns.  [Citations.]  [¶] While the appellate court must determine that the supporting evidence is reasonable, inherently credible, and of solid value, the court must review the evidence in the light most favorable to the [judgment], and must presume every fact the jury could reasonably have deduced from the evidence.  [Citations.]  Issues of witness credibility are for the jury.  [Citations.]"  (*People v. Boyer* (2006) 38 Cal.4th 412, 479-480.)  " 'We review the sufficiency of the evidence to support an enhancement using the same standard we apply to a conviction.  [Citation.]' "  (*People v. Wilson* (2008) 44 Cal.4th 758, 806 (*Wilson*).)

Section 12022.53, subdivision (b), states in relevant part:  "Notwithstanding any other provision of law, any person who, in the commission of [robbery], *personally uses* a firearm, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years.  The firearm need not be operable or loaded for this enhancement to apply."  (Italics added.)

The jury was instructed that " '[s]omeone personally uses a firearm if he or she *intentionally* does any of the following:  (one) *displays the weapon in a menacing manner*; (two) hits someone with a weapon, or (three) fires the weapon.' "  (CALCRIM No. 3146, italics added.)  Defendant does not dispute that this instruction correctly states

---

**8**  The parties agree that the enhancement cannot be sustained on an aiding and abetting theory because that theory applies only where it is pleaded and proved that the defendant violated section 186.22, subdivision (b).  (§ 12022.53, subd. (e).)

the law.  (See, e.g., *People v. Granado* (1996) 49 Cal.App.4th 317, 321 (*Granado*); *People v. Johnson* (1995) 38 Cal.App.4th 1315, 1319.)

Our high court has observed that use of a firearm includes " 'conduct *which produces a fear of harm or force by means or display of a firearm in aiding the commission of one of the specified felonies.*  "Use" means, among other things, "to carry out a purpose or action by means of," to "make instrumental to an end or process," and to "apply to advantage.  [Citation.]"  The obvious legislative intent to deter the use of firearms in the commission of the specified felonies requires that "uses" be broadly construed.' [Citation.]"  (*Wilson*, *supra*, 44 Cal.4th at p. 806.)  The court went on to hold, " '[W]hen a defendant *deliberately* shows a gun, or otherwise *makes its presence known*, and there is no evidence to suggest any purpose other than intimidating the victim (or others) so as to successfully complete the underlying offense, the jury is entitled to find a facilitative use rather than an incidental or inadvertent exposure.' " (*Id.* at p. 807, citing *Granado*, *supra*, 49 Cal.App.4th at p. 325, italics added.)  Thus, as the *Granado* court noted, if substantial evidence establishes that defendant "displayed a firearm in order to facilitate the commission of an underlying crime, a use of the gun has occurred." (*Granado*, at p. 325.)

Here, as suggested by the language in *Wilson* and *Granado*, we determine there is substantial evidence that defendant (1) made the presence of the gun known, (2) that he intended to make the gun's presence known, and (3) by making the presence of the gun known, he facilitated the successful completion of the charged crime by intimidating the victims.  As we have noted, both loss prevention officers testified that they recognized the object defendant pulled out from under the driver's seat was a gun before and during the time defendant handed it to Rhodes.  Indeed, one officer explained that he started backing up when he saw defendant pull out an object and started backing up even more when he saw that it was a gun and defendant handed the gun to Rhodes.  Based on this evidence, defendant made the presence of the gun known and in doing so, the successful

18

completion of the crime was facilitated by intimidating the victims. And "there was no reasonable explanation for defendant's conduct other than a desire to facilitate the crime." (*Granado*, *supra*, 49 Cal.App.4th at p. 325.) Indeed, it was defendant's conduct that initiated the transformation of a simple shoplifting into a robbery.

There was also substantial evidence that defendant *deliberately* made the gun's presence known to the loss prevention officers. Defendant pulled it out from under the seat in their presence, and there was no evidence he attempted to conceal the gun from their view. And indeed, he did not. Both Wilke and Miller saw it in his possession. The additional act of handing the gun to Rhodes in the presence of the two victims further demonstrates defendant's intent of making the gun's presence known to the two victims, both while he had it in his possession and after he transferred actual possession to Rhodes. Under these circumstances, the jury was entitled to find a facilitative use rather than an incidental or inadvertent exposure. (*Wilson*, *supra*, 44 Cal.4th at p. 807; *Granado*, *supra*, 49 Cal.App.4th at p. 325.) The section 12022.53, subdivision (b), enhancement is supported by substantial evidence.

## DISPOSITION

The judgment is affirmed.


      MURRAY      , J.


We concur:


      MAURO      , Acting P. J.


      HOCH      , J.