Filed 6/16/21  P. v. Pedrisco CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>PEDRO MORALES PEDRISCO,<br><br>    Defendant and Appellant. | H045310<br>(Santa Clara County<br> Super. Ct. No. C1354610) |

Defendant Pedro Morales Pedrisco was convicted by jury trial of participating in a criminal street gang (count 1; Penal Code, § 186.22, subd. (a)),[1] assault with a deadly weapon (count 2; § 245, subd. (a)(1)), and three counts of witness intimidation by force or the threat of force (counts 3-5; § 136.1, subd. (c)(1)).  The jury found true allegations that defendant committed the assault and witness intimidation offenses for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C), (b)(4)).  Defendant admitted he had suffered two prior strike convictions (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)) and two prior serious felony convictions (§ 667, subd. (a)), and that he had served one prior prison term (§ 667.5, subd. (b)).  The trial court sentenced defendant to an indeterminate prison term of 40 years to life.

On appeal, defendant contends:  (1) the trial court abused its discretion and violated his due process rights by admitting evidence of defendant's two prior felony convictions as predicate gang offenses; (2) two of the witness intimidation counts are not

---

[1] All further references are to the Penal Code unless otherwise indicated.

supported by substantial evidence because the prosecution relied on an invalid theory of guilt; (3) the trial court erred by giving jury instructions on aiding and abetting; (4) remand is warranted for the trial court to exercise its discretion to strike the two five-year prior serious felony conviction enhancements; and (5) the one-year prior prison term enhancement should be stricken. We reject defendant's first three contentions. As to the sentencing claims, the Attorney General concedes remand is warranted. We agree. Thus, we remand for the trial court to exercise its discretion to strike the five-year prior serious felony conviction enhancements and direct the trial court to strike the one-year prior prison term enhancement.

## I.   BACKGROUND

### A.   *Prosecution's Case*

#### 1.   *The Stabbing Incident*

On April 13, 2013, brothers Brian and Mark Ramirez, both college students in San Jose, were drinking with their cousin, Christian Murillo, in their residence. Sometime before midnight, around 11:30 or 11:45 p.m., they left to attend a party. They first went to a liquor store. They left the liquor store and began walking toward an intersection. Two men on the other side of the intersection, later identified as defendant and Jose Ortega, asked if they were "busters" or "gang banging." As Brian, Mark, and Murillo walked across the intersection, the two men approached and said, "Hey, we're talking to you," and "Busters, slow down, come here." Murillo responded, "We don't gang bang," or, "We're not gangsters." Murillo, Mark, and Brian continued to cross the street and tried to get away. The two men called out, "Hey we're talking to you. He's talking to you, wait," as they began following the Ramirez brothers and Murillo.

The two men approached and asked again, "Are you guys busters," and, "What do you guys bang?" One of the men suddenly pulled out a long knife and stabbed Brian in the arm. At trial, Mark identified defendant as Brian's assailant. Brian "looked down" and saw that he "was gushing blood," so he took off his shirt and covered the wound. He

2

ran to the liquor store, went inside, and quickly left because "[s]omething told [him] not to go inside there." Defendant and Ortega followed him and waited for him outside the store. When Brian left, his assailant told him, "Don't call the police," and, "You're lucky to still be breathing[.]"

As Brian was leaving the liquor store, Mark and Murillo went inside. Mark asked the clerk, Amanpreet Singh, to call an ambulance, but Singh appeared reluctant to do so. Singh testified that he did not make the call because he was scared. Moments later Ortega entered the liquor store. Ortega told them, " 'Don't call the cops,' or . . . 'Don't call the fucking police or else' " Ortega then said that if " 'nobody call[s] the cops [then] we'll leave you guys alone.' " Mark and Murillo responded, " 'We'll be gone and we won't call the police. We'll be fine.' " Ortega left the store.

Mark and Murillo found Brian hiding underneath a vehicle down the street outside the liquor store. Brian, Mark, and Murillo went back to their residence and dialed 911. Brian was taken by ambulance to the hospital, and he required four or five staples to close the arm wound. It took three or four months for his arm to fully heal.

On April 18, 2013, Brian was shown a "six-pack photo lineup that included defendant Pedrisco." Brian said the photograph of defendant "kind of looks like" the man who stabbed him. "He said he recognized the facial features," but then said, "that's not him." When the interviewing officer "clarified [Brian's] statements, he said that was the person [who] stabbed him." The second time Brian went through the photo lineup, he identified defendant as the man who stabbed him. Brian also identified Ortega as defendant's accomplice.

Mark was also shown a six-pack photo lineup, which included defendant's photograph. Mark initially failed to identify defendant, twice saying "that's not him" as he examined the photograph. Viewing the lineup again, Mark identified defendant as the person who stabbed Brian, saying, "it would be this person if the person had gained some

3

weight." Mark added, "if the guy [in the photograph] was between 5-9 and 5-11, it was definitely him." Mark also identified Ortega as defendant's accomplice.[2]

### 2. *Ortega's Testimony*

Ortega testified for the prosecution pursuant to a plea agreement. Ortega admitted that the prosecution had reduced the charges against him in exchange for his testimony.

For "maybe . . . more than ten years," Ortega was a member of Varrio Williams Street (VWST), a Sureño street gang based in San Jose. Defendant was also a member of VWST. In 2013, defendant was the most respected member of VWST, and "could be" described as the leader of the gang. During that time period, Ortega took orders from defendant.

On April 13, 2013, Ortega attended a party for defendant's sister in Sunnyvale. Ortega smoked crystal methamphetamine and drank about 12 beers. Defendant drank a bottle of Hennessy, and according to Ortega, "was drunk." Defendant and Ortega decided to leave the party, and were driven to San Jose and dropped off by defendant's brother-in-law.

After they were dropped off, defendant and Ortega walked to a corner and waited for the light to change. As they were crossing, Ortega saw three other people crossing in the opposite direction. Ortega did not think they looked like Norteño gang members, but rather "students from the university." Defendant "stayed back to talk to them in the middle of the street." Ortega reached the other side of the street, turned, and saw defendant was speaking with the three men. Defendant then "touched the arm" of one of the men, and then Ortega saw that the man was bleeding from his upper arm. The bleeding man ran, and defendant followed him. Ortega was "scared," but his "reaction was to follow." Ortega then saw the other two men run toward a liquor store. Ortega followed them "to go tell them not to call the police." Ortega did so "[b]ecause [he] was

---

[2] Murillo did not testify.

4

under the influence of drugs and [he] didn't want to get involved. [He] intimidated them so they would not call the police." He stated that he did not intimidate them to "protect" defendant.

Ortega left the store and encountered defendant walking down the sidewalk. Defendant handed Ortega a bloody knife. Ortega then realized that defendant had stabbed that person in the middle of the street. Ortega took the knife home, cleaned it, and kept it. The knife was never recovered.

Ortega also testified about an incident that took place when he was being transported from jail to court to testify. Defendant was put on the same bus as Ortega. Defendant told Ortega that Ortega "wasn't thinking about [his] family," and that defendant "was going to send [Ortega's] photograph to Mexico[,] so that if [Ortega] got deported to Mexico, they would have [his] picture there." Defendant also said to Ortega: " 'You have a brother. You have a sister. You have a dad. You're not thinking about them.' " Ortega understood these comments to be threats.

### 3. Additional Threats

On May 31, 2013, VWST member Alejandro Arellano entered the same liquor store involved in the stabbing, approached Singh, and said, "If you testify, we have problems." Alejandro made a stabbing motion with his hand. Alejandro testified that he was drunk at the time and did not recall why he tried to dissuade Singh from testifying. Alejandro also testified that Ortega was "an acquaintance" and "a friend," but not a member of VWST. He had also heard of defendant from "friends" and "acquaintances," but was not aware if defendant was a member of VWST at the time.

### 4. Call Detail Records

Jim Cook testified as an expert in the area of "call records, text messages, text content data records, carrier records, mapping of cellular records and cellular technology." He analyzed call detail records for cell phone numbers associated with defendant and Ortega. Cook testified that defendant's call detail records showed "over

5

182 call events in less than a three-month period" with Ortega's cell phone number. He also determined that defendant and Ortega had been in contact multiple times on April 13, 2013. He explained that defendant's call detail records also showed that defendant and Ortega were in the vicinity of the crime scene from 11:54 p.m. to 11:57 p.m. on the night of the stabbing, and that Ortega tried to call defendant multiple times during that time period.

### 5. *Gang Evidence*

District Attorney Criminal Investigator Justin DeOliviera, who was previously a detective in the Gang Investigations Unit for the San Jose Police Department, testified as an "expert in the area of Hispanic street gangs in Santa Clara County."

DeOliviera testified that there are two major gangs in San Jose: Norteños and Sureños. Within those two major gangs, there are numerous "subsets," or small individual gangs affiliated with the larger group. VWST is one of 15 Sureño-affiliated gangs in San Jose. Its territory includes "downtown San Jose, William Street, which runs south of San Jose State and runs between First and William Park, which is around 19th Street, 17th Street."

DeOliviera testified that gang members will go " 'hunting' " by going to rival territories to look for targets. Sureños use the term " 'buster hunting,' " with buster being "a derogatory term for a Norteño that a Sureño would use." Gang members go hunting to gain respect and influence, both for themselves and for the gang as a whole. DeOliviera explained that "backing up the gang" is an important part of "putting in work" and gaining respect. This means that "if we have a group of gang members and there's a confrontation" involving one gang member, other gang members are "required to go back him up." This includes "cleaning it up afterwards," meaning "if there's someone who saw it," other gang members will "go deal with that guy and . . . talk to him."

DeOliviera described five predicate offenses committed by VWST and Sureño gang members.[3] DeOliviera expressed the opinion that the charged offenses were committed for the benefit of VWST. He based his opinion on the fact that the crimes occurred in VWST territory, they were committed by two active members of VWST working together, and the victims were called "busters."

### B.    Defense Case

Defendant did not call any witnesses or present any evidence. At closing, defendant argued that the prosecution had failed to provide sufficient evidence of the charged offenses.

## II.    DISCUSSION

### A.    Admission of Defendant's Prior Felony Convictions

Defendant argues that the trial court abused its discretion under Evidence Code section 352 and violated his due process rights by admitting evidence of his two prior felony convictions. He contends that the prior convictions were cumulative of other evidence, and therefore were unnecessary to prove the gang enhancements.

#### 1.    Background

Prior to trial, the prosecution sought to introduce evidence of five convictions as predicate gang offenses: (1) defendant's February 2009 conviction for assault with a deadly weapon; (2) defendant and Jorge Arellano's February 2009 convictions for robbery with gang enhancement findings; (3) Ortega's May 2016 conviction for unlawful taking of a vehicle; (4) Ortega's May 2016 conviction for witness intimidation with a gang enhancement finding; and (5) Manuel Alvarado's June 2007 conviction for assault with a deadly weapon with a gang enhancement finding. Defendant opposed the admission of his prior convictions under Evidence Code section 352.

---

[3] The predicate offenses will be discussed in greater detail below.

At an in limine hearing, the trial court granted the motion to admit the predicate offenses, stating: "And, as I shared with the attorneys, the court is between a rock and a hard spot, because when you have predicate crimes as part of the charging document and it has to be proved to the jurors and the defense is not in a position to stipulate or admit to gang conduct, because it would have dire consequences to them, not only as to the gang count, which is 1, but also the other counts and the alleged further allegations. Then the People have to prove it up through these predicate crimes. [¶] And so, although the court has discretion to disallow [defendant's sections] 245 and 211 [convictions], that the defendant has suffered, for all practical purposes that discretion is very limited by the court, because the People have to put on their case-in-chief. At this point . . . I am going to grant the motion by the People."

At trial, the prosecution requested that the trial court take judicial notice of an additional sixth predicate offense—that Alejandro Arellano had been convicted of witness intimidation and had admitted that his offense "was committed for the benefit of a criminal street gang." Defendant stated, "No objection," and the trial court took judicial notice of the conviction as requested.

        2.     *Analysis*

Defendant argues that admission of his prior convictions as predicate offenses for the gang enhancements was cumulative in light of the other predicate offenses also proffered at the in limine hearing.

In order to prove a gang enhancement, the prosecution must establish that a defendant committed his crime "for the benefit of, at the direction of, or in association with any criminal street gang." (§ 186.22, subd. (b)(1).) A group is a " 'criminal street gang' " only if its "members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (§ 186.22, subd. (f).) A " 'pattern of criminal gang activity' means the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" offenses

8

enumerated in the statute.  (§ 186.22, subd. (e).)  "A predicate offense [may] be established by proof of an offense the defendant committed on a separate occasion." (*People v. Tran* (2011) 51 Cal.4th 1040, 1046 (*Tran*).)  Further, with respect to the number of predicate offenses introduced, "although the court need not limit the prosecution's evidence to one or two separate offenses lest the jury find a failure of proof as to at least one of them, the probative value of the evidence inevitably decreases with each additional offense, while its prejudicial effect increases, tilting the balance towards exclusion." (*Id*. at p. 1049.)  "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

We review the trial court's rulings on the admission of predicate offenses for an abuse of discretion.  (*Tran*, *supra*, 51 Cal.4th at p. 1050; *People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436 [applying abuse of discretion standard of review to defendant's contention that trial court erred in permitting prosecution to introduce evidence of excessive number of predicate gang offenses].)

In *Tran*, the prosecution established a gang's predicate offenses, as required by section 186.22, subdivision (f), by presenting evidence of crimes the defendant himself committed on behalf of the gang.  On appeal, the defendant argued that in light of evidence of crimes committed by other gang members, evidence of his past crimes was cumulative and therefore unduly prejudicial.  In rejecting this contention, the court stated: "[D]efendant cites no authority for the argument that the prosecution must forgo the use of relevant, persuasive evidence to prove an element of a crime because the element might also be established through other evidence.  The prejudicial effect of evidence defendant committed a separate offense may, of course, outweigh its probative value if it is merely cumulative regarding an issue not reasonably subject to dispute.  [Citations.] But the prosecution cannot be compelled to ' "present its case in the sanitized fashion

9

suggested by the defense." ' [Citation.] When the evidence has probative value, and the potential for prejudice resulting from its admission is within tolerable limits, it is not *unduly* prejudicial and its admission is not an abuse of discretion." (*Tran*, *supra*, at pp. 1048-1049.)

Here, the trial court acted within its discretion in admitting evidence of the predicate offenses because the evidence had probative value and was not unduly prejudicial. (*Tran*, *supra*, 51 Cal.4th at p. 1049.) The predicate offenses involving defendant were for assault with a deadly weapon and robbery. This evidence had clear probative value with respect to the gang enhancement as it provided "direct proof of several *ultimate facts* necessary for conviction." (*Id*. at p. 1048.) Further, the potential for prejudice was within tolerable limits. (*Id*. at p. 1049.) The *Tran* court reasoned that the potential for undue prejudice is decreased when the other act evidence emanates from sources independent of the charged offenses, when the other act evidence is less inflammatory than the charged offenses, and when the other act resulted in a criminal conviction. (*Id*. at pp. 1047.) These factors are present here. The prior offenses occurred years before his arrest on the current charges and were based on court records, sources independent of the charged offenses. The prior offenses were no more inflammatory than the charged offenses, and also resulted in criminal convictions, lessening the likelihood that the jury would be inclined to punish defendant for an uncharged act regardless of his guilt for the charged offenses. (*Ibid*.) Finally, the admission of the prior convictions, which was expeditiously established by court records, did not necessitate an undue amount of time. (Evid. Code, § 352.)

In arguing that the challenged predicate offenses were cumulative, defendant contends that "the prosecution presented evidence establishing as many as *eleven predicate offenses*[] in addition to [his] two prior convictions." (Italics added.) This contention, however, misstates the record as it existed when the trial court made its ruling. When the trial court admitted evidence of the predicate offenses, it was asked to

10

admit evidence of only five predicate offenses, including defendant's two prior convictions. "We must assess the trial court's ruling refusing to preclude evidence based on the facts made known to the court when it was asked to make the ruling. [Citations.] 'To do otherwise would require us to hold the trial court to an impossible standard.' [Citation.]" (*People v. Ramos* (2013) 216 Cal.App.4th 195, 208.)

In this case, when the trial court was asked to admit defendant's two prior convictions as predicate gang offenses, the prosecution had alleged only five predicate offenses. As the Attorney General observes, "[o]nly five predicate offenses could be established prior to trial. Neither the trial court nor the prosecutor could predict with any certainty that jurors would find that the charged offenses, and those committed by [defendant]'s coparticipants, also constituted predicate offenses within the meaning of 186.22, subdivision (j)." "That the prosecution might be able to develop evidence of predicate offenses committed by other gang members . . . does not require exclusion of evidence of a defendant's own separate offense to show a pattern of criminal gang activity." (*Tran*, *supra*, 51 Cal.4th at p. 1049, fn. omitted.) Because the evidence was probative and not unduly prejudicial, the trial court did not abuse its discretion in admitting it. (*Id.* at p. 1050.)

Finally, we reject defendant's related claim that in admitting the evidence the trial court deprived him of due process and a fair trial. Defendant cites *McKinney v. Rees* (1993) 993 F.2d 1378, where the court found a due process violation when evidence was admitted that the defendant had previously owned and carried knives that were not related to the subject offense. (*Id.* at pp. 1381-1383.) The court reasoned that the evidence served no valid purpose, and served only as improper propensity evidence. (*Id.* at pp. 1383-1384.)

Here, as we have explained, the evidence was relevant for a valid purpose, and therefore it did not serve only as improper propensity evidence. Because there was a

11

valid purpose supporting admission of the challenged evidence, defendant's due process rights were not violated.

### B. Use of Natural and Probable Consequences Theory

Defendant argues that his convictions for witness intimidation by use of force or fear in counts 4 and 5 were not supported by substantial evidence because the prosecution relied on the natural and probable consequences doctrine, which was an invalid theory of guilt. He contends that as the perpetrator of the target crimes, he cannot be convicted as an aider and abettor of nontarget crimes under a natural and probable consequences theory. In the alternative, defendant contends that "the prosecution did not adduce substantial evidence that a reasonable person in [his] position would have expected Ortega to intimidate Mark Ramirez and Amanpreet Singh."

#### 1. Background

The prosecution's theory for count 3 was that defendant committed witness intimidation when he chased and threatened Brian. For counts 4 and 5, the prosecution's theory was that defendant aided and abetted witness intimidation under a natural and probable consequences theory: "Okay. [Counts] 4 and 5 . . . . They are all the same elements [as count 3] except 4 and 5 apply to Mark Ramirez and Mr. Singh, . . . [who] came in and testified before us. We know from watching the video the defendant never directly entered the store and never directly threatened either Mr. Singh or Mark Ramirez. Mark Ramirez and Mr. Singh didn't testify to any threats from the defendant . . . so we clearly know . . . the defendant[] is not directly responsible for these crimes. [¶] The evidence also shows that there was no time for Mr. Ortega and [the defendant] to have a powwow at the time of crime . . . . It was very clear. Brian Ramirez was stabbed, freaked, ran and was pursued. There was no communication that we heard from Mr. Ortega when he testified about what the defendant Pedrisco told him to do or not do." In summation, the prosecution argued that the natural and probable consequences theory was "the only theory that holds." "Under the circumstances, a reasonable person would

12

have known that dissuasion of Mark Ramirez and Mr. Singh was a natural and probable consequence that flowed from the stabbing of Brian Ramirez when Brian Ramirez ran away."

### 2. *Analysis*

Defendant contends that his conviction for intimidation of a witness relied on an invalid theory because he did not aid and abet the target crimes, but rather he was the perpetrator of those crimes.

This contention was rejected in *People v. Olguin* (1994) 31 Cal.App.4th 1355 (*Olguin*). There, Olguin, Mora, and Hilario, all members of the same gang, encountered several members of a rival gang, including victim Ramirez. (*Id.* at pp. 1366-1367.) After an initial verbal confrontation, Mora punched Ramirez in the face, knocking him down. Ramirez got up and started walking toward the defendants. Olguin then shot and killed Ramirez. (*Id.* at p. 1367.) Both Olguin and Mora were found guilty of second degree murder, with Mora's conviction based on a natural and probable consequences theory. (*Id.* at p. 1366.)

On appeal, Mora argued the natural and probable consequences doctrine did not apply to him because he was the perpetrator of the target offense of assault on Ramirez. (*Olguin*, *supra*, 31 Cal.App.4th at p. 1375.) The appellate court disagreed: "The flaw in Mora's reasoning is that a perpetrator of an assault and an aider and abettor are *equally* liable for the natural and foreseeable consequences of their crime. Both the perpetrator and the aider and abettor are principals, and *all* principals are liable for the natural and reasonably foreseeable consequences of their crimes . . . ." (*Id.* at p. 1376.) "In fact, this case aptly demonstrates the folly of Mora's position. If it were adopted, Hilario, who did nothing but stand by and watch, could be convicted of murder if the jury were convinced he was there to back up his homeboys and thereby encouraged Olguin and Mora in the assault on Ramirez. But Mora, who actually perpetrated the assault, would escape liability on the basis that he was the party who initiated the action. [¶] Fortunately, that

is not the law. Mora was a principal in the assault on Ramirez and therefore responsible for the natural and probable consequences of that assault." (*Ibid.*)

In this case, as in *Olguin*, defendant's claim fails because the natural and probable consequences doctrine extends aiding and abetting liability to the perpetrator of the target offense. As a perpetrator of the target offense, defendant was a principal, "and *all* principals are liable for the natural and reasonably foreseeable consequences of their crimes . . . ." (*Olguin*, *supra*, 31 Cal.App.4th at p. 1376.) Thus, the natural and probable consequences doctrine was a valid legal theory in this case, and defendant was responsible for any reasonably foreseeable offenses committed as a consequence of his assault.

Defendant cites *People v. Prettyman* (1996) 14 Cal.4th 248 (*Prettyman*), superseded by statute on another ground as stated in *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1103, review granted Nov. 13, 2019, S258175, and *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), superseded by statute on another ground as stated in *People v. Gentile* (2020) 10 Cal.5th 830, 84, for the proposition that the natural and probable consequences doctrine may be applied only to aiders and abettors of target crimes. Defendant's reliance on these cases is misplaced. In *Prettyman*, our high court addressed the issue of uncharged target offenses for aiders and abettors. (*Prettyman*, *supra*, at p. 254.) In *Chiu*, the court addressed whether an aider and abettor may be convicted of first degree premeditated murder under a natural and probable consequences theory. (*Chiu*, *supra*, at p. 158.) Neither case involved a purported limitation of natural and probable consequences liability to aiders and abettors, as opposed to perpetrators. Because the facts of the cases primarily involved aider and abettor liability, the language used to describe the natural and probable consequences doctrine was understandably limited to that context. The cases neither considered nor held that use of the doctrine was restricted to aiders and abettors of target crimes. "It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268,

14

fn. 10.)  In sum, we find that the theory relied on by the prosecution was a valid legal theory of criminal liability.

We now turn to defendant's sufficiency of the evidence claim.  "In reviewing a challenge to the sufficiency of the evidence, 'we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.]  We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence . . . .  "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.]  We do not reweigh evidence or reevaluate a witness's credibility.' " (*People v. Alexander* (2010) 49 Cal.4th 846, 917.)

An aider and abettor or perpetrator is not only guilty of the crime originally intended, but of any crime actually committed so long as the commission of that crime was reasonably foreseeable.  Under the natural and probable consequences doctrine, the " 'question is not whether the aider and abettor [or perpetrator] *actually* foresaw the additional crime, but whether, judged objectively, it was *reasonably* foreseeable. [Citations.]' " (*People v. Medina* (2009) 46 Cal.4th 913, 920.)  A reasonably foreseeable consequence is to be evaluated under all the factual circumstances of the individual case and is a factual issue to be resolved by the jury. (*Olguin*, *supra*, 31 Cal.App.4th at p. 1376.)

Here, substantial evidence supports defendant's convictions for witness intimidation in counts 4 and 5.  Prior to the assault, the perpetrators challenged Brian, Mark, and Murillo using the term "busters," a derogatory term used by Sureños for Norteños.  DeOliviera testified that "if we have a group of gang members and there's a confrontation" involving one gang member, other gang members are "required to go back

15

him up." He noted that gang members not only earn respect by committing assaults, "but also being there to back up whoever is in the assault." Ortega testified that although he was "scared," his "reaction was to follow" and to prevent the victims from calling the police. Based on the foregoing, a reasonable trier of fact could find that under the circumstances of this case, witness intimidation was a reasonably foreseeable consequence of assault with a deadly weapon.[4]

### C.    Instructional Claim

Defendant argues that the trial court prejudicially erred by giving jury instructions on aiding and abetting because in his view no substantial evidence supported these instructions. He also argues that the trial court prejudicially erred by giving jury instructions on the natural and probable consequences doctrine, which he claims was inapplicable in this case.

In connection with counts 4 and 5, the trial court instructed the jury with CALCRIM No. 402 [Natural and Probable Consequences Doctrine]. In addition, the trial court instructed on aiding and abetting by giving CALCRIM Nos. 400 [Aiding and Abetting: General Principles] and 401 [Aiding and Abetting:  Intended Crimes].

"A party is entitled to a requested instruction if it is supported by substantial evidence. [Citation.] Evidence is '[s]ubstantial' for this purpose if it is 'sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.' [Citation.]" (*People v*. *Ross* (2007) 155 Cal.App.4th 1033, 1049-1050.) Further, the trial court has a duty to instruct on general principles of law relevant to the issues raised by the evidence. (*People v*. *Earp* (1999) 20 Cal.4th 826, 885.) We review a claim of instructional error de novo. (*People v*. *Rivera* (2019) 7 Cal.5th 306, 326.)

---

[4] Because we find sufficient evidence to support the convictions for witness intimidation under a natural and probable consequences theory, we need not address defendant's alternative argument that there was insufficient evidence of direct aiding and abetting.

Here, the trial court did not err by giving instructions on aiding and abetting, nor did it err by giving instructions on the natural and probable consequences doctrine. As discussed above, the natural and probable consequences doctrine was a valid theory of liability for two of the witness intimidation counts. The trial court therefore did not err in giving CALCRIM No. 402, which instructed the jury about how to apply the natural and probable consequences doctrine. Further, the trial court also did not err in giving CALCRIM Nos. 400 and 401. Put simply, the instructions, which set forth general principles of aiding and abetting liability and direct aiding and abetting liability, were necessary for the jury to understand CALCRIM No. 402. By contextualizing the natural and probable consequences doctrine with general principles of aiding and abetting law, the trial court provided the jury with information relevant to the issues raised by the evidence. Indeed, in its closing argument, the prosecution commented on the contrast between traditional principles of aiding and abetting and the natural and probable consequences doctrine by emphasizing that its theory of liability for counts 4 and 5 was *not* based on direct aiding and abetting. Because the instructions were relevant, the trial court did not err by giving CALCRIM Nos. 400 and 401 in connection with CALCRIM No. 402. Thus, we reject defendant's contention that the trial court committed instructional error by giving these instructions.

### D.     *Serious Felony Conviction Enhancements*

Defendant contends that his case should be remanded to allow the trial court to exercise its sentencing discretion to strike the section 667, subdivision (a) enhancements in light of recently enacted Senate Bill No. 1393.

#### 1.     *Background*

In sentencing defendant, the trial court imposed two consecutive five-year terms for prior serious felony conviction enhancements (§ 667, subd. (a)(1)). The probation officer noted that "there's no discretion" on whether to impose the sentences.

17

## 2. Analysis

Defendant was sentenced in September 2017. At that time, the trial court was required to impose a five-year consecutive term under section 667, subdivision (a) when a prior serious felony conviction enhancement was found true under that provision. (Former § 667, subd. (a).) "On September 30, 2018, the Governor signed Senate Bill [No.] 1393 which, effective January 1, 2019, amend[ed] sections 667[, subdivision] (a) and 1385[, subdivision] (b) to allow a court to exercise its discretion to strike or dismiss a prior serious felony conviction for sentencing purposes. (Stats. 2018, ch. 1013, §§ 1-2.)" (*People v. Garcia* (2018) 28 Cal.App.5th 961, 971 (*Garcia*).)

Under *In re Estrada* (1965) 63 Cal.2d 740, "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date. [Citation.]" (*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted (*Brown*).) "The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses. [Citations.]" (*People v. Nasalga* (1996) 12 Cal.4th 784, 792.) Since nothing in Senate Bill No. 1393 suggests a legislative intent that the amendments to sections 667, subdivision (a) and 1385, subdivision (b) apply only prospectively, "it is appropriate to infer, as a matter of statutory construction, that the Legislature intended Senate Bill [No.] 1393 to apply to all cases to which it could constitutionally be applied, that is, to all cases not yet final when Senate Bill [No.] 1393 bec[ame] effective on January 1, 2019. [Citations.]" (*Garcia*, *supra*, 28 Cal.App.5th at p. 973.) Here, defendant's case was not final on January 1, 2019. (*People v. Vieira* (2005) 35 Cal.4th 264, 306 [" '[A] judgment is not final until the time for petitioning for a writ of certiorari in the United States Supreme Court has passed. [Citations.]' "].)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.]' " (*People v. Gutierrez* (2014)

58 Cal.4th 1354, 1391 (*Gutierrez*).)  When the record shows that the trial court proceeded with sentencing on the assumption that it lacked discretion, remand for resentencing is necessary "unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.'  [Citations.]" (*Ibid.*)

Here, the trial court proceeded with sentencing under the assumption that it lacked discretion.  In addition, the record does not " 'clearly indicate[ ]' " whether the trial court would have decided to strike the prior serious felony conviction enhancements had it been aware it had such discretion.  (*Gutierrez*, *supra*, 58 Cal.4th at p. 1391.)  The Attorney General concedes that defendant's case should be remanded.  We agree that a remand is required.

### E.     Prior Prison Term Enhancement

The trial court imposed and stayed a one-year prior prison term enhancement based on defendant's prison term for a prior conviction for second degree robbery. Defendant argues in supplemental briefing that in light of Senate Bill No. 136, his prior prison term enhancement should now be stricken.  The Attorney General concedes that remand is warranted.

Effective January 1, 2020, Senate Bill No. 136 amended section 667.5, subdivision (b), to limit the one-year enhancement for a prior prison term so that it will apply only where the offense underlying the prior prison term was a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).  (Stats. 2019, ch. 590, § 1; § 667.5, subd. (b).)

As discussed, under *Estrada*, we presume the Legislature intended the amended statute to apply to all cases not yet final on the statute's operative date, and defendant's case is not yet final.  (*Brown*, *supra*, 54 Cal.4th at p. 323.)  We find nothing in Senate Bill No. 136 that suggests a legislative intent that the amendments to section 667.5, subdivision (b) apply only prospectively.  Therefore, it is appropriate to infer, as a matter

19

of statutory construction, that the Legislature intended it to apply to all cases to which it could constitutionally be applied. (*People v. Conley* (2016) 63 Cal.4th 646, 657.)

Because defendant's prior prison term was not served for a sexually violent offense, the section 667.5, subdivision (b) enhancement is now unauthorized under the amended statute. We will direct the trial court to modify the judgment to strike the prior prison term enhancement.[5]

## III.    DISPOSITION

The judgment is reversed. On remand, the trial court is directed to strike the prior prison term enhancement and to exercise its discretion as to whether to strike defendant's prior serious felony conviction enhancements. If the court strikes either of those enhancements, it shall resentence defendant. If not, it shall prepare an amended abstract of judgment deleting the prison prior and forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.

---

[5] In his opening brief, defendant argued that the trial court erred by staying, rather than dismissing, the one-year prior prison term enhancement because the enhancement relied on the same prior conviction as one of the prior serious felony conviction enhancements (§ 667, subd. (a)). Because the prior prison term enhancement will be stricken, we need not address this argument.

20

_____

ELIA, J.

WE CONCUR:


_____

GREENWOOD, P.J.



_____

GROVER, J.




*People v. Pedrisco*
H045310